## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| PENNSYLVANIA NATIONAL MUTUAL<br>  CASUALTY INSURANCE COMPANY,<br><br>                    Plaintiff,<br><br>v.<br><br>RIVER CITY ROOFING, LLC,<br><br>         **Serve: Rod Young,**<br>                **Registered Agent**<br>                **8514 Sanford Drive**<br>                **Henrico, VA 23228**<br><br>and<br><br>BRANCH BUILDS, INC.,<br><br>         **Serve: C T Corporation System,**<br>                **Registered Agent**<br>                **4701 Cox Road, Ste. 285**<br>                **Glen Allen, VA 23060**<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    C. A. No. <u>3:21-cv-00365</u><br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR DECLARATORY JUDGMENT

The Plaintiff, Pennsylvania National Mutual Casualty Insurance Company ("Penn National"), by counsel, states the following for its Complaint for Declaratory Judgment.

1.     This action seeks declaratory judgment under Rule 57 of the Federal Rules of Civil Procedure and Title 28, Section 2201 of the United States Code, to declare the rights and other legal relations surrounding questions of actual controversy that presently exist between and among Penn National and the Defendants, River City Roofing, LLC ("River City") and Branch Builds, Inc. ("Branch," collectively with River City, the "Defendants," and collectively with River City and Penn National, the "Parties"). *See* 28 U.S.C. § 2201; Fed. R. Civ. P. 57.

<u>JURISDICTION</u>

2.      The Court has original jurisdiction in this action under Title 28, Section 1332 of the United States Code, as this lawsuit is a civil action between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

<u>PARTIES</u>

3.      Penn National is an insurance company organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Harrisburg, Pennsylvania.  Penn National is therefore a Pennsylvania citizen, and it is not a citizen of any other state.

4.      River City is or was a limited liability company organized and existing under the laws of the Commonwealth of Virginia, with its principal place of business in Henrico, Virginia. The only member of River City known to Penn National is Rod Young, who is believed to reside in Henrico County, Virginia.  Upon information and belief, none of River City's members is a Pennsylvania citizen.  River City is therefore a citizen of Virginia, and it is not a citizen of Pennsylvania.

5.      Branch is a corporation organized and existing under the laws of the Commonwealth of Virginia, with its principal place of business in Roanoke, Virginia.  Branch is therefore a Virginia citizen, and it is not a citizen of Pennsylvania.

<u>VENUE</u>

6.      The venue of this action is properly predicated upon Title 28, Section 1391(a) of the United States Code, in that jurisdiction is founded on diversity of citizenship and this action is brought within the judicial district and division in which at least one of the Defendants resides, where at least one of the Defendants does business, and/or in which a substantial part of the events or omissions giving rise to the claim(s) alleged herein occurred.

## NATURE OF THE ACTION

7.      The matters at issue in this litigation relate to the Parties' dispute over their respective rights and duties under a contract for commercial general liability insurance issued to River City by Penn National, as well as a contract for umbrella liability insurance that Penn National issued to River City, as alleged further below.

8.      More specifically, in this action Penn National seeks a judicial declaration that under the terms and conditions of those insurance contracts it has no duty to defend and indemnify River City in a civil lawsuit instituted against it by Branch that is presently pending before the Circuit Court for the City of Richmond, Virginia.

9.      This action is limited only to those contractual grounds on which Penn National contends it should be relieved from any duty to defend and indemnify River City in that lawsuit.

10.     This action does not seek an adjudication of other contractual grounds on which Penn National questions its duty to indemnify River City and/or Branch for any judgment in the underlying lawsuit or for any settlement of the underlying lawsuit, as such other grounds depend upon facts to be proven in the underlying lawsuit's trial and which therefore are not yet ripe for adjudication.

11.     In the event that the Court enters a judgment adverse to Penn National and finding that Penn National has a duty to defend River City in the underlying lawsuit, Penn National expressly reserves the right to assert all of its further contractual grounds for challenging the duty of indemnification following a final judgment in the underlying lawsuit, at which point those grounds would become ripe for adjudication.

## STATEMENT OF FACTS & UNDERLYING ALLEGATIONS

12.     Penn National issued a commercial general liability insurance contract to River City, contract number CL9 0727954, for the contract periods March 15, 2016 to March 15, 2017, and March 15, 2017 to March 15, 2018 (the "CGL Contract").

13.     A certified copy of the CGL Contract's commercial general liability coverage part, including all relevant declarations and endorsements, for the March 15, 2017 to March 15, 2018 contract period is appended hereto as Exhibit "1."

14.     Penn National also issued an umbrella liability insurance contract to River City, contract number UL90727954, for the contract periods March 15, 2016 to March 15, 2017, and March 15, 2017 to March 15, 2018 (the "Umbrella Contract," and collectively with the CGL Contract, the "Insurance Contracts").

15.     A certified copy of the Umbrella Contract's commercial general liability coverage part, including all relevant declarations and endorsements, for the March 15, 2017 to March 15, 2018 contract period is appended hereto as Exhibit "2."

16.     Under the Insurance Contracts, Penn National agreed to insure River City subject to the contracts' respective terms, conditions, limitations and exclusions.

17.     Among the Insurance Contracts' respective terms, conditions, limitations, and exclusions was the requirement that River City pay premiums to Penn National in consideration for the insurance provided to River City under the Insurance Contracts.

18.     River City failed to pay the premium it owed for each of the Insurance Contracts in July 2017.

19.     Therefore, by separate Notices dated July 11, 2017, Penn National wrote to River City and informed it that because of River City's failure to pay the premiums due, each of the Insurance Contracts would be canceled effective July 31, 2017, at 12:01 a.m.

20.     Copies of the Notices of Cancellation issued to River City are appended hereto as Exhibits "3" and "4," respectively.

21.     The Notices further advised River City that if it wished to keep the Insurance Contracts in effect, River City would have to pay the premiums it owed by July 31, 2017.  (See Exh. 3; Exh. 4.)

22.     River City did not pay the premiums it owed, and both Insurance Contracts were therefore cancelled effective July 31, 2017.

23.     Branch has instituted a lawsuit against River City and a co-defendant, DC Quality Builders, Inc. ("DQB"), in the Circuit Court for the City of Richmond, Virginia, styled *Branch Builds, Inc. v. DC Quality Builders, Inc., et al.*, case number 20-3726 (the "Underlying Action"), in which it alleges that each of the defendants in that lawsuit is liable to Branch for certain purported defects in the construction of a piece of residential property for which Branch's alleged predecessor in interest, Branch & Associates, Inc. ("B&A"), served as general contractor, and for which B&A hired River City and DQB to serve as subcontractors.

24.     A true copy of Branch's Complaint in the Underlying Action is appended hereto as Exhibit "5."

25.     More specifically, in its Complaint Branch alleges that it or B&A was hired by Shockoe Valley View Genesis, LLC ("Genesis"), a property owner, to serve as general contractor to construct the Shockoe Valley Apartments (the "Project") in the City of Richmond.  (Exh. 5, ¶ 4.)

26.     Branch alleges that DQB served as a subcontractor for the Project and was responsible for "all wood framing, trusses and windows at the Project. . . ."  (Exh. 5, ¶¶ 6-7.)

27.     Branch alleges that River City served as a subcontractor for the Project and was responsible for "all roofing work and all aluminum and composition siding at the Project. . . ." (Exh. 5, ¶¶ 8-9.)

28.     Branch alleges that once the Project was completed Genesis claimed to have discovered "substantial structural and material defects" in it, that the Project was not "constructed in accordance with approved . . . plans, drawings, and specifications," that River City and/or DQB employed "defective workmanship and materials," and that River City and/or DQB were negligent "in the selection of materials and building techniques used" in the Project.  (Exh. 5, ¶ 10.)

29.     Branch alleges that Genesis claimed River City had failed to construct or supply the Project's roof, aluminum and composition siding "in accordance with the plans, specifications, and industry standards," and also that River City "was negligent, and, as a result, there was water intrusion and property damage to the" Project.  (Exh. 5, ¶ 12.)

30.     Similarly, Branch alleges that Genesis claimed DQB had failed to construct or supply the Project's "wood framing, trusses and windows . . . in accordance with the plans, specifications and industry standards," and also that DQB "was negligent, and, as a result, there was water intrusion and property damage to the" Project.  (Exh. 5, ¶ 11.)

31.     Branch alleges that it or B&A "informed both DQB and River City of the allegations of Genesis, and tendered the indemnity and defense of the damages claimed by Genesis to each under their respective subcontracts."  (Exh. 5, ¶ 13.)

32.     Branch also alleges that it or B&A "requested that DQB['s] and River City's insurers . . . provide indemnity and defense of the damages claimed by Genesis under the respective subcontracts and as an additional insured under the[ir] respective [insurance] policies." (Exh. 5, ¶ 14.)

33.    Branch alleges that it "undertook to repair the damages to the [Project] and the property damages sustained by Genesis; informed DQB and River City of these repairs; invited their participation in performing the repairs, and invited them to inspect or investigate the damages or the repairs being performed."  (Exh. 5, ¶ 15.)

34.    Branch alleges as well that it "also paid and will pay to Genesis other damages associated with the property damage at the of [*sic*] the" Project.  (Exh. 5, ¶ 16.)

35.    Branch alleges that "[n]either DQB nor River City (nor their insurers) agreed to indemnify or defend Branch from the claims of Genesis."  (Exh. 5, ¶ 17.)

36.    Branch alleges as well that "[n]either DQB nor River City participated in the repairs being made by Branch" at the Project.  (Exh. 5, ¶ 18.)

37.    Branch further alleges that it "has incurred or will incur costs and expenses in excess of $2.8 million, along with attorney's fees and other costs" as a result of the alleged acts and omissions of River City and DQB.  (Exh. 5, ¶ 19.)

38.    Based on these allegations, Branch alleges that River City breached certain terms in its subcontractor agreement with Branch, *inter alia* "by providing defective materials and/or workmanship on the Project."  (Exh. 5, ¶¶ 33-38.)

39.    Branch alleges that it has sustained certain damages in the form of monetary expenditures as a result of River City's purported breaches of contract, which it seeks to recover from River City in the Underlying Action.  (Exh. 5, ¶¶ 39-40.)

40.    Branch alleges as well that River City breached an implied warranty on the quality of River City's materials and workmanship "by providing defective materials and/or workmanship on the Project."  (Exh. 5, ¶¶ 42-43.)

41.     Branch avers that it has sustained damages in the form of monetary expenditures as a result of River City's alleged breach of implied warranty, which it seeks to recover from River City in the Underlying Action.  (Exh. 5, ¶¶ 44-45.)

42.     Branch makes nearly identical allegations with respect to DQB.  (Exh. 5, ¶¶ 20-32.)

43.     River City has requested defense and indemnity benefits from Penn National pursuant to the Insurance Contracts (the "Claim").

44.     Penn National is presently defending River City in the Underlying Action subject to Penn National's full and complete reservation of its rights under the Insurance Contracts.

### FIRST REQUEST FOR DECLARATORY JUDGMENT – THE ALLEGED PROPERTY DAMAGE DID NOT OCCUR DURING THE INSURANCE CONTRACTS' POLICY PERIOD

45.     Penn National hereby restates the allegations set forth in Paragraphs 1-44 of this Complaint as if those Paragraphs were re-alleged verbatim here.

46.     Branch, by and through its counsel, has reported to River City that the water infiltration alleged in the Underlying Action was first detected at the Project "six months after the certificate of occupancy" had been issued for the Project.

47.     A true copy of the certificate of occupancy issued for the Project is appended hereto as Exhibit 6.

48.     That certificate of occupancy was issued on April 5, 2017.  (Exh. 6.)

49.     By Branch's admission, therefore, there was no alleged "property damage" at the Project until October 2017.

50.     At the very least, the alleged property damage at the Project did not manifest itself until October 2017.

51.     The CGL Contract provides that the insurance granted under it "applies to . . . 'property damage' only if . . . [t]he . . . 'property damage' occurs during the policy period." (Exh. 1 (form CG 00 01 0413), sec. I.A.1.b(2).)

52.     The CGL Contract's Declarations define the policy period as March 15, 2017, to March 15, 2018.  (Exh. 1, Decls.)

53.     Due to River City's failure to pay the premium it owed for the CGL Contract, however, Penn National canceled the CGL Contract effective July 31, 2017.

54.     Similarly, the Umbrella Contract provides that the insurance granted under it also "applies to . . . 'property damage' only if . . . [t]he . . . 'property damage' occurs during the policy period."  (Exh. 2 (form 71 1184 1116), sec. I.A.1.c(2).)

55.     The Umbrella Contract's Declarations define the policy period as March 15, 2017, to March 15, 2018.  (Exh. 2, Decls.)

56.     Due to River City's failure to pay the premium it owed for the Umbrella Contract, however, Penn National canceled the Umbrella Contract effective July 31, 2017.

57.     Both of the Insurance Contracts were thus canceled effective July 31, 2017, due to River City's failure to pay the premiums due for both contracts.

58.     Because Penn National canceled each of the Insurance Contracts effective July 31, 2017, the policy period for each of the Insurance Contract became March 15, 2017 to July 31, 2017.

59.     According to Branch, there was no "property damage" at the Project earlier than October 2017.

60.     In fact, the alleged property damage at the Project did not first manifest until sometime in October 2017, approximately three months after both of the Insurance Contracts were terminated.

61.     Branch makes no allegations in the Underlying Action contrary to its counsel's admission that there was no water damage, and/or no manifestation of water damage, at the Project until some six months after the certificate of occupancy was issued.

62.     Because there was no "property damage" at the Project before October 2017, and because the first manifestation of the alleged property damage at the Project did not occur until after the Insurance Contracts' termination on July 31, 2017, the alleged property damage did not occur during either Insurance Contract's policy period.

63.     Therefore, because "property damage" did not occur during the Insurance Contracts' respective policy periods and because the first manifestation of the alleged property damage at the Project occurred outside the Insurance Contracts' respective policy periods, the alleged property damage at the Project is not "property damage" to which the insurance granted under either of the Insurance Contracts applies.

64.     For at least this reason, the Court should enter declaratory judgment in Penn National's favor.

### SECOND REQUEST FOR DECLARATORY JUDGMENT – THERE IS NO ALLEGED "OCCURRENCE" TO IMPLICATE THE INSURANCE CONTRACTS

65.     Penn National hereby restates the allegations set forth in Paragraphs 1-64 of this Complaint as if those Paragraphs were re-alleged verbatim here.

66.     The CGL Contract defines "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions. An accident

shall include 'property damage' to other than 'your work' arising from 'your work'." (Exh. 1 (End. form 71 1403 1116), sec. I.13.)

67.     The Umbrella Contract defines "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions. An accident shall include 'property damage' to other than 'your work' arising from 'your work'." (Exh. 2 (End. form 71 1422 0311), sec. V.16.)

68.     The Underlying Action alleges that Genesis has claimed River City failed to construct or supply the Project's roof, aluminum and composition siding "in accordance with the plans, specifications, and industry standards," and also that River City "was negligent, and, as a result, there was water intrusion and property damage to the" Project. (Exh. 5, ¶ 12.)

69.     Under governing law, faulty workmanship does not constitute an "accident."

70.     A mere allegation of "negligence," without more, is insufficient to allege an accident.

71.     Thus, even if the Insurance Contracts otherwise were implicated by the Claim and the Underlying Action – which Penn National denies – any duty of indemnity it might have under the Insurance Contracts does not include the cost of repairing or replacing River City's allegedly faulty work.

72.     For this separate and additional reason, the Court should enter declaratory judgment in Penn National's favor.

THIRD REQUEST FOR DECLARATORY JUDGMENT – THE CLAIM IS BARRED BY
THE INSURANCE CONTRACTS' RESPECTIVE "IMPAIRED PROPERTY" EXCLUSIONS

73.     Penn National hereby restates the allegations set forth in Paragraphs 1-72 of this Complaint as if those Paragraphs were re-alleged verbatim here.

- 11 -

74. Even assuming *arguendo* that the Underlying Action otherwise implicated the Insurance Contracts (it does not), any possible liability that Penn National might have to River City and/or Branch in connection with that lawsuit is limited under the Insurance Contracts' respective terms, limitations, conditions and exclusions.

75. The CGL Contract provides that the insurance granted under it "does not apply to . . . '[p]roperty damage' to 'impaired property' or property that has not been physically injured, arising out of . . . [a] defect, deficiency, inadequacy or dangerous condition in . . . 'your work' . . . or . . . [a] delay or failure by [River City] or anyone acting on [River City's] behalf to perform a contract or agreement in accordance with its terms." (Exh. 1 (form CG 00 01 0413), sec. I.A.2.m.)

76. The CGL Contract defines "your work" to mean "[w]ork or operations performed by [River City] or on [its] behalf . . . and . . . [m]aterials, parts or equipment furnished in connection with such work or operations." (Exh. 1 (form CG 00 01 0413), sec. V.22(a).)

77. The CGL Contract's definition of "your work" includes "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work', and . . . [t]he providing of or failure to provide warnings or instructions." (Exh. 1 (form CG 00 01 0413), sec. V.22(b).)

78. The CGL Contract defines "impaired property" to mean "tangible property, other than . . . 'your work', that cannot be used or is less useful because . . . [i]t incorporates . . . 'your work' that is known or thought to be defective, deficient, inadequate or dangerous . . . or . . . [River City] ha[s] failed to fulfill the terms of a contract . . . if such property can be restored to use by . . . [t]he repair, replacement, adjustment or removal of . . . 'your work'. . . ." (Exh. 1 (form CG 00 01 0413), sec. V.8.)

79.     The Umbrella Contract similarly provides that the insurance granted under it "does not apply to . . . '[p]roperty damage' to 'impaired property' or property that has not been physically injured, arising out of . . . [a] defect, deficiency, inadequacy or dangerous condition in . . . 'your work' . . . or . . . [a] delay or failure by [River City] or anyone acting on [River City's] behalf to perform a contract or agreement in accordance with its terms."  (Exh. 2 (form 71 1184 1116), sec. I.A.2.p.)

80.     The Umbrella Contract defines "your work" to mean "[w]ork or operations performed by [River City] or on [its] behalf . . . and . . . [m]aterials, parts or equipment furnished in connection with such work or operations."  (Exh. 2 (form 71 1184 1116), sec. V.30(a).)

81.     The Umbrella Contract's definition of "your work" includes "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work', and . . . [t]he providing of or failure to provide warnings or instructions."  (Exh. 2 (form 71 1184 1116), sec. V.30(b).)

82.     The Umbrella Contract defines "impaired property" to mean "tangible property, other than . . . 'your work', that cannot be used or is less useful because . . . [i]t incorporates . . . 'your work' that is known or thought to be defective, deficient, inadequate or dangerous . . . or . . . [because River City] ha[s] failed to fulfill the terms of a contract . . . if such property can be restored to use by . . . [t]he repair, replacement, adjustment or removal of . . . 'your work'. . . ." (Exh. 2 (form 71 1184 1116), sec. V.10.)

83.     Branch alleges that it "undertook to repair the damages to the [Project] and the property damages sustained by Genesis; informed DQB and River City of these repairs; invited their participation in performing the repairs; and invited them to inspect or investigate the damages or the repairs being performed."  (Exh. 5, ¶ 15.)

- 13 -

84.    Branch alleges as well that it "also paid and will pay to Genesis other damages associated with the property damage at the of [*sic*] the" Project.  (Exh. 5, ¶ 16.)

85.    Branch alleges as well that "[n]either DQB nor River City participated in the repairs being made by Branch" at the Project.  (Exh. 5, ¶ 18.)

86.    Branch further alleges that it "has incurred or will incur costs and expenses in excess of $2.8 million, along with attorney's fees and other costs" as a result of the alleged acts and omissions of River City and DQB.  (Exh. 5, ¶ 19.)

87.    Based on these allegations, Branch alleges that River City breached certain terms in its subcontractor agreements with Branch, *inter alia* "by providing defective materials and/or workmanship on the Project."  (Exh. 5, ¶¶ 33-38.)

88.    The Project therefore meets the Insurance Contracts' respective definitions of "impaired property" because it allegedly is property other than River City's work that cannot be used, is less useful, and/or is dangerous because it incorporates River City's work, and the Project allegedly was able to be restored to use by the repair, replacement, adjustment, or removal of River City's work.

89.    Because the property damage alleged by Branch purportedly resulted from a defect, deficiency, or inadequacy in River City's work, and that damage allegedly was sustained by "impaired property" – the Project – the Insurance Contracts do not require Penn National to defend or indemnify River City or anyone else in connection with that alleged property damage.

90.    For this further reason, declaratory judgment should be entered in Penn National's favor and against the Defendants.

## FOURTH REQUEST FOR DECLARATORY JUDGMENT – THE CLAIM IS BARRED BY THE INSURANCE CONTRACTS' RESPECTIVE "YOUR WORK" EXCLUSIONS

91.     Penn National hereby restates the allegations set forth in Paragraphs 1-90 of this Complaint as if those Paragraphs were re-alleged verbatim here.

92.     The CGL Contract provides that the insurance granted under it "does not apply to . . . '[p]roperty damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard'."  (Exh. 1 (form CG 00 01 0413), sec. I.A.2.l.)

93.     The CGL Contract defines "products-completed operations hazard" to "[i]nclude[ ] all . . . 'property damage' occurring away from premises [River City] own[s] or rent[s] and arising out of . . . 'your work' except . . . [w]ork that has not yet been completed or abandoned.  However, 'your work' will be deemed completed at the earliest of the following times . . . (a) [w]hen all of the work called for in [River City's] contract has been completed . . . (b) [w]hen all of the work to be done at the job site has been completed if [River City's] contract calls for work at more than one job site . . . [or] (c) [w]hen that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.  Work that may need service . . . correction, repair or replacement but which is otherwise complete will be treated as completed."  (Exh. 1 (form CG 00 01 0413), sec. V.16.a.)

94.     The Umbrella Contract similarly provides that the insurance granted under it "does not apply to . . . '[p]roperty damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard'."  (Exh. 2 (form 71 1184 1116), sec. I.A.2.o.)

95.     The Umbrella Contract defines "products-completed operations hazard" to include "all . . . 'property damage' occurring away from premises [River City] own[s] or rent[s] and arising out of . . . 'your work' except . . . [w]ork that has not yet been completed or abandoned.  However, 'your work' will be deemed completed at the earliest of the following times . . . [w]hen all of the

work called for in [River City's] contract has been completed . . . [or] [w]hen all of the work to be done at the job site has been completed if [River City's] contract calls for work at more than one job site . . . [or] [w]hen that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project. Work that may need service . . . corrections, repair or replacement, but which is otherwise complete, will be treated as completed." (Exh. 2 (form 71 1184 1116), sec. V.20.a(2).)

96. The Underlying Action alleges that River City served as a subcontractor for the Project and was responsible for "all roofing work and all aluminum and composition siding at the Project. . . ." (Exh. 5, ¶¶ 8-9.)

97. The Underlying Action alleges that after the Project was completed Genesis claimed to have discovered "substantial structural and material defects" in it, that the Project was not "constructed in accordance with approved . . . plans, drawings, and specifications," that River City employed "defective workmanship and materials," and that River City was negligent "in the selection of materials and building techniques used" in the Project. (Exh. 5, ¶ 10.)

98. Branch alleges that Genesis has claimed River City failed to construct or supply the Project's roof, aluminum and composition siding "in accordance with the plans, specifications, and industry standards," and also that River City "was negligent, and, as a result, there was water intrusion and property damage to the" Project. (Exh. 5, ¶ 12.)

99. The Project was completed before the alleged property damage and water intrusion occurred. (*See* Exh. 5, ¶ 10.)

100. Similarly, the Project was completed before the alleged property damage and water intrusion first manifested. (*See* Exh. 5, ¶ 10.)

101. River City's work on the Project's roof and siding therefore falls within the Insurance Contracts' respective "products-completed operations hazards."

102. Under the Insurance Contracts' respective "your work" exclusions, therefore, any and all damage to River City's work on the Project – the roof and the siding – is excluded from the insurance provided under both of the Insurance Contracts.

103. For this additional reason, as well, declaratory judgment should be entered in Penn National's favor and against the Defendants.

FIFTH REQUEST FOR DECLARATORY JUDGMENT –
THE CLAIM IS BARRED BY THE INSURANCE CONTRACTS' RESPECTIVE
"FUNGI OR BACTERIA" EXCLUSIONS

104. Penn National hereby restates the allegations set forth in Paragraphs 1-103 of this Complaint as if those Paragraphs were re-alleged verbatim here.

105. The CGL Contract provides that the insurance granted under it "does not apply to . . . 'property damage' which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any 'fungi' or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage." (Exh. 1 (form CG 21 67 1204), sec. I.A.2.a.)

106. The CGL Contract defines "fungi" to mean "any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi." (Exh. 1 (form CG 21 67 1204), sec. C.)

107. The Umbrella Contract similarly provides that the insurance granted under it "does not apply to . . . 'property damage' which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any 'fungi' or bacteria on or within a building or structure, including its contents,

regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage." (Exh. 2 (form 71 1184 0909), sec. I.A.2.u.)

108. The Umbrella Contract defines "fungi" to mean "any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi." (Exh. 2 (form 71 1184 0909), sec. I.V.9.)

109. Branch alleges that, as a result of River City's purportedly defective work, "there was water intrusion and property damage to the" Project. (Exh. 5, ¶ 12.)

110. Branch further alleges that because of River City's purported breach of its subcontractor agreement with Branch, "Branch was forced to incur costs and expenses in the repairs of the Project, and all associated water intrusion damage. . . ." (Exh. 5, ¶ 39.)

111. Branch also alleges that because of River City's purported breach of an implied warranty on its work in connection with the Project, "Branch was forced to incur costs and expenses in the repairs of the Project, and all associated water intrusion damage. . . ." (Exh. 5, ¶ 44.)

112. Mold infestation commonly results from, and/or is associated with, water infiltration to real property.

113. To the extent Branch seeks to recover damages from River City for the costs of repairing and/or remediating "property damage" caused by mold – "fungus" – Penn National has no duty to indemnify either River City or Branch in connection with such alleged damage.

114. For this still further reason, declaratory judgment should be entered in Penn National's favor and against the Defendants.

## SIXTH REQUEST FOR DECLARATORY JUDGMENT – THE CLAIM IS BARRED BY THE INSURANCE CONTRACTS' "CONTRACTUAL LIABILITY" EXCLUSIONS

115.    Penn National hereby restates the allegations set forth in Paragraphs 1-114 of this Complaint as if those Paragraphs were re-alleged verbatim here.

116.    The CGL Contract generally excludes from the insurance provided under it "'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement."  (Exh. 1 (form CG 00 01 0413), sec. I.A.2.b.)

117.    The CGL Contract excepts from that exclusion "liability for damages . . . [a]ssumed in a contract or agreement that is an 'insured contract' . . . ."  (Exh. 1 (form CG 00 01 0413), sec. I.A.2.b(2).)

118.    The CGL Contract defines "insured contract" to include "[t]hat part of any . . . contract or agreement pertaining to [River City's] business . . . under which [it] assume[s] the tort liability of another party to pay for . . . 'property damage' to a third person or organization, provided the . . . 'property damage' is caused, in whole or in part, by [River City] or by those acting on [its] behalf.  However, such part of a contract or agreement shall only be considered an 'insured contract' to the extent [River City's] assumption of the tort liability is permitted by law. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement."  (Exh. 1 (End. form CG 24 26 0413), sec. f.)

119.    Similarly, the Umbrella Contract generally excludes from the insurance provided under it "'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement."  (Exh. 2 (form 71 1184 1116), sec. I.A.2.b.)

120.    The Umbrella Contract excepts from that exclusion "liability for damages . . . [a]ssumed in a contract or agreement that is an 'insured contract' . . . ."  (Exh. 2 (form 71 1184 1116), sec. I.A.2.b(2).)

121.     The Umbrella Contract defines "insured contract" to include "[t]hat part of any . . . contract or agreement pertaining to [River City's] business . . . under which [it] assume[s] the tort liability of another party to pay for . . . 'property damage' to a third person or organization, provided the . . . 'property damage' is caused, in whole or in part, by [River City] or by those acting on [its] behalf.  However, such part of a contract or agreement shall only be considered an 'insured contract' to the extent [River City's] assumption of the tort liability is permitted by law. 'Tort liability' means a liability that would be imposed by law in the absence of any contract or agreement."  (Exh. 2 (End. form 71 1882 1116), sec. V.11.g.)

122.     Branch has alleged that it served as the general contractor for the Project.  (Exh. 5, ¶ 4.)

123.     Branch has alleged that following completion of work on the Project and the alleged discovery of water infiltration and property damage there, Branch, "[p]ursuant to its contractual and legal obligations with Genesis . . . undertook to repair the damages to the Apartments and the property damages sustained by Genesis. . . ."  (Exh. 5, ¶ 15.)

124.     Branch has further alleged that "[p]ursuant to its contractual and/or legal obligations with Genesis, [it] also paid and will pay to Genesis other damages associated with the property damage at the of [*sic*] of the Apartments."  (Exh. 5, ¶ 16.)

125.     Branch has alleged that River City contractually agreed to defend or indemnify Branch from Genesis' claims and demands.  (Exh. 5, ¶ 36.)

126.     Branch has alleged that River City is therefore contractually liable to it to indemnify it for the costs Branch allegedly has incurred in performing its "contractual and legal" duties to Genesis.  (Exh. 5, ¶ 40.)

127.    Any contractual liability that Branch might have had to Genesis does not qualify as a liability that would be imposed by law in the absence of any contract or agreement and, therefore, it could not constitute "tort liability" excepted from the Insurance Contracts' respective contractual-liability exclusions.

128.    The Claim is therefore excluded from the insurance granted under the Insurance Contracts by the Insurance Contracts' respective "contractual liability" exclusions.

129.    Declaratory judgment should be entered in Penn National's favor for this reason, as well.

130.    There exists a justiciable controversy of such immediacy between Penn National and the Defendants that this Court should declare the Parties' respective rights to avoid the possible accrual of damages to Penn National.

WHEREFORE, Penn National respectfully prays that this Court enter an Order, ADJUDGING, ORDERING and DECREEING that:

(1)    Penn National has no duty to defend River City or any other party in the Underlying Action;

(2)    Penn National has no duty to pay any amount for which River City might be found liable in connection with the Underlying Action;

(3)    Penn National has no duty to pay any amount to River, Branch, and/or any other party in the Underlying Action;

(4)    Penn National has no duty to pay any amount to anyone else whomsoever in connection with the Underlying Action, to the extent such persons' interests are adequately represented in this lawsuit; and

(5)    Penn National is awarded all such other and further relief that the Court

deems appropriate and just.

Respectfully submitted,

**PENNSYLVANIA NATIONAL MUTUAL
CASUALTY INSURANCE COMPANY**

By:  SETLIFF LAW, P.C.

_____
            /s/ Kevin T. Streit
                Of Counsel

Kevin T. Streit  (VSB No. 45024)
SETLIFF LAW, P.C.
4940 Dominion Boulevard
Glen Allen, Virginia 23060
(804) 377-1260
(804) 377-1280 (facsimile)
kstreit@setlifflaw.com
*Counsel for Pennsylvania National
    Mutual Casualty Insurance Company*