**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| PENNSYLVANIA NATIONAL MUTUAL | ) | |
| CASUALTY INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. 3:21cv365 |
| | ) | |
| RIVER CITY ROOFING, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW SUPPORTING ITS MOTION FOR**
**SUMMARY JUDGMENT AGAINST DEFENDANT BRANCH BUILDS, INC.**

The plaintiff, Pennsylvania National Mutual Casualty Insurance Company ("Penn National"), by counsel, states the following in support of its motion for summary judgment[1] against defendant Branch Builds, Inc. ("Branch," and collectively with Penn National, the "Parties"), as provided under Rule 56 of the Federal Rules of Civil Procedure and this Court's Local Rule 56. For the reasons set forth herein, Penn National respectfully requests that the Court grant its Motion and enter judgment in its favor.

On June 8, 2021, Penn National instituted this lawsuit against River City Roofing, LLC ("River City") and against Branch seeking a declaration of the parties' respective rights and duties under a contract of commercial general liability insurance and a contract of umbrella liability insurance that Penn National had issued to River City. (Dkt.[2] 1.) As detailed herein, based on the undisputed facts of record there are at least five reasons why Penn National has no duty to defend or indemnify River City, or pay Branch, in connection with the underlying lawsuit pending in the Circuit Court for the City of Richmond, Virginia, styled *Branch Builds, Inc. v. DC Quality Builders, Inc., et al.*, case number 20-3726 (the "Underlying Action"), and no duty to pay any judgment entered in Branch's favor in that

---

[1]    Hereinafter referenced as the "Motion," and cited herein as "Mot., ¶ __."
[2]    Documents contained in the Court's record of this action are referenced herein by the Court's ECF docket number, and are cited herein as "Dkt. __."

lawsuit:  (1) the insurance contracts at issue were canceled prior to the putative "occurrence" alleged in the Underlying Action; (2) that lawsuit does not allege an "occurrence" as defined in the subject insurance contracts; and (3) even assuming that the insurance contracts remained in effect when an "occurrence" took place, the facts alleged in the Underlying Action implicate the insurance contracts' exclusions for (a) "impaired property," (b) "your work," and (c) "contractual liability."[3]  For all these reasons, the Motion should be granted.

### LEGAL STANDARD GOVERNING ENTRY OF SUMMARY JUDGMENT

In deciding a motion for summary judgment, the Court must view the facts in the light most favorable to the opposing party and give that party the benefit of reasonable inferences to be drawn from the underlying facts.  *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157-59 (1970); *Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir. 1995).  In contesting a summary-judgment motion, "[t]he opposing party must demonstrate that a triable issue of fact exists. . . ."  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine" issue of material fact is present only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Id.*

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."  *Powers v. Sims & Levin Realtors*, 396 F. Supp. 12, 22 (E.D. Va. 1975). *See* Fed. R. Civ. P. 56(c)(1).

### STATEMENT OF UNDISPUTED MATERIAL FACTS[4]

1.  In the Underlying Action, Branch alleges that each of the defendants in that lawsuit, including River City, is liable to Branch for certain purported defects in the construction of a piece of residential property for which Branch's alleged predecessor in interest, Branch & Associates, Inc. ("B&A"),

---

[3]    In its Complaint for Declaratory Judgment (Dkt. 1), Penn National also requests judgment under its insurance contracts' respective "fungi" exclusions. Although Penn National is not moving for summary judgment on that particular ground, it reserves the right to assert that exclusion at trial if the Motion is not granted.

[4]    This Statement of Undisputed Material Facts is referenced herein as the "Statement," and is cited as "Stmt., ¶ __."

served as general contractor, and for which B&A hired River City and D.C. Quality Builders, Inc. ("DQB") to serve as subcontractors.  (Dkt. 1, ¶ 23; Dkt. 1-6; Dkt. 6, ¶ 23.)

2.   A true copy of Branch's complaint in the Underlying Action is attached to Penn National's complaint for declaratory judgment as Exhibit 5.  (Dkt. 1, ¶ 24; Dkt. 1-6; Dkt. 6, ¶ 24.)

3.   Penn National issued a commercial general liability insurance contract to River City, contract number CL9 0727954, for the contract periods March 15, 2016, to March 15, 2017, and March 15, 2017, to March 15, 2018 (the "CGL Contract"), a true copy of which is appended to Penn National's complaint for declaratory judgment as Exhibit 1.  (Dkt. 1, ¶¶ 12-13; Dkt. 1-2; Exh. D, ¶¶ 7-8.)

4.   Penn National also issued an umbrella liability insurance contract to River City, contract number UL90727954, for the contract periods March 15, 2016 to March 15, 2017, and March 15, 2017 to March 15, 2018 (the "Umbrella Contract," and collectively with the CGL Contract, the "Insurance Contracts"), a true copy of which is appended to Penn National's complaint as Exhibit 2.  (Dkt. 1, ¶¶ 14-15; Dkt. 1-3; Exh. D, ¶¶ 9-10)

5.   Pursuant to a full and complete reservation of its rights under the Insurance Contracts, at law and in equity, Penn National has been defending River City (the "Claim") in connection with a lawsuit filed against River City in the Circuit Court for the City of Richmond, Virginia, styled *Branch Builds, Inc. v. DC Quality Builders, Inc., et al.*, case number 20-3726 (the "Underlying Action").  (Dkt. 1, ¶¶ 43-44; Exh. D, ¶ 11.)

6.   In the Underlying Action, Branch alleges that it or B&A was hired by Shockoe Valley View Genesis, LLC ("Genesis"), a property owner, to serve as general contractor to construct the Shockoe Valley Apartments (the "Project") in the City of Richmond.  (Dkt. 1, ¶ 25; Dkt. 1-6, ¶ 4.; Dkt. 6, ¶¶ 24-25)

7.   A true copy of the certificate of occupancy issued for the Project is appended to Penn National's Complaint as Exhibit 6.   (Dkt. 1,  ¶ 47;  Dkt. 1-7;  Dkt. 6,  ¶ 47;  Exh. A,  no. 2;  Exh. B,  no. 2, attachment 2.)

8. The certificate of occupancy was issued on April 5, 2017. (Dkt. 1, ¶ 48; Dkt. 1-7; Dkt. 6, ¶ 48.)

9. Branch has reported that the water infiltration alleged in the Underlying Action was first detected at the Project "six months after the certificate of occupancy" was issued for the Project, *i.e.*, in October, 2017. (Dkt. 1, ¶ 46; Exh. A, no. 1); Exh. B, no. 1, attachment 1, 9/18/2020 1:05 p.m. email fr. K. Hardt to R. Policano.[5]

10. Branch alleges in the Underlying Action that River City served as a subcontractor for the Project and was responsible for "all roofing work and all aluminum and composition siding at the Project. . . ." (Dkt. 1, ¶ 27; Dkt. 1-6, ¶¶ 8-9; Dkt. 6, ¶¶ 24, 27.)

11. Branch alleges that once the Project was completed, Genesis claimed to have discovered "substantial structural and material defects" in it, that the Project was not "constructed in accordance with approved . . . plans, drawings, and specifications," that River City and/or DQB employed "defective workmanship and materials," and that River City and/or DQB were negligent "in the selection of materials and building techniques used" in the Project. (Dkt. 1, ¶¶ 28, 97; Dkt. 1-6, ¶ 10; Dkt. 6, ¶¶ 24, 28, 97.)

12. Branch further alleges that Genesis claimed River City had failed to construct or supply the Project's roof, aluminum and composition siding "in accordance with the plans, specifications, and industry standards," and also that River City "was negligent, and, as a result, there was water intrusion and property damage to the" Project. (Dkt. 1, ¶ 29; Dkt. 1-6, ¶ 12; Dkt. 6, ¶¶ 24, 29.)

---

[5] Branch objected to Penn National's request for admission number 1 on the ground that the email communication to which Branch was asked to admit consisted of "information relating to preliminary confidential settlement negotiations between counsel for Branch and defense counsel for River City. . . . [and] [t]he [subject] emails are part of a string of emails relating to these preliminary negotiations. . . ." (Exh. A, no. 1.) Nothing in the emails at issue reflects any such settlement context, however – and, importantly, Branch bears the burden to prove that the emails were sent in the course of such negotiations. *See Stack v. Abbott Labs., Inc.*, No. 1:12cv148, 2016 U.S. Dist. LEXIS 148676, *10 (M.D.N.C. Oct. 27, 2016). And even if Branch could meet its burden, Rule 56(c)(2) only prevents the Court from considering this evidence if it "cannot be submitted in a form that would be admissible in evidence" – such as direct- or cross-examination of Branch's witnesses and/or other witnesses at trial. *See* Fed. R. Civ. P. 56(c)(2). Clearly, the evidence *can* be so presented.

13. Branch alleges, as well, that it or B&A informed "River City of the allegations of Genesis, and tendered the indemnity and defense of the damages claimed by Genesis to [River City] under [its] . . . subcontract[ ]," and that it or B&A "requested that . . . River City's insurer[ ] . . . provide indemnity and defense of the damages claimed by Genesis under the . . . subcontract[ ] and as an additional insured under" the Insurance Contracts. (Dkt. 1, ¶¶ 31-32, 125-126; Dkt. 1-6, ¶¶ 13-14, 36, 40; Dkt. 6, ¶¶ 24, 31-32, 125-126.)

14. Branch alleges that "[p]ursuant to its contractual and legal obligations with Genesis," it "undertook to repair the damages to the [Project] and the property damages sustained by Genesis; informed River City of these repairs; invited River City's participation in performing the repairs, and invited River City to inspect or investigate the damages or the repairs being performed." (Dkt. 1, ¶ 33, 123; Dkt. 1-6, ¶ 15; Dkt. 6, ¶¶ 24, 33, 123.)

15. Branch further alleges that it "also paid and will pay to Genesis other damages associated with the property damage at the of [*sic*] the" Project," and that neither "River City (nor [its] insurer[ ]) agreed to indemnify or defend Branch from the claims of Genesis." (Dkt. 1, ¶¶ 34-35; Dkt. 1-6, ¶¶ 16-17, 124; Dkt. 6, ¶¶ 24, 34-35, 124.)

16. Branch alleges as well that River City did not "participate[ ] in the repairs being made by Branch" at the Project. (Dkt. 1, ¶ 36; Dkt. 1-6, ¶ 18; Dkt. 6, ¶¶ 24, 36.)

17. Branch asserts that it "has incurred or will incur costs and expenses in excess of $2.8 million, along with attorney's fees and other costs" as a result of the alleged acts and omissions of River City and DQB. (Dkt. 1, ¶ 37; Dkt. 1-6, ¶ 19 Dkt. 6, ¶¶ 24, 37.)

18. Based on these allegations, Branch contends that River City breached certain terms in its subcontractor agreement with Branch, *inter alia*, "by providing defective materials and/or workmanship on the Project." (Dkt. 1, ¶ 38; Dkt. 1-6, ¶¶ 33-38; Dkt. 6, ¶¶ 24, 38.)

19. Branch avers that it has sustained damages in the form of monetary expenditures as a result of River City's purported breaches of contract, which it seeks to recover from River City in the Underlying Action. (Dkt. 1, ¶ 39; Dkt. 1-6, ¶¶ 39-40; Dkt. 6, ¶¶ 24, 39.)

20. Branch alleges as well that River City breached an implied warranty on the quality of River City's materials and workmanship "by providing defective materials and/or workmanship on the Project," and avers that it has sustained damages in the form of monetary expenditures as a result of River City's alleged breach of implied warranty, which it seeks to recover from River City in the Underlying Action. (Dkt. 1, ¶¶ 40-41; Dkt. 1-6, ¶¶ 42-45; Dkt. 6, ¶¶ 24, 40-41.)

21. Under the Insurance Contracts, Penn National agreed to insure River City subject to the contracts' respective terms, conditions, limitations and exclusions. (Dkt. 1, ¶ 16; Dkt. 1-2; Dkt. 1-3; Dkt. 6, ¶ 16.)

22. Among those terms and conditions was the requirement that River City pay premiums to Penn National in consideration for the insurance provided to River City under the Insurance Contracts. (Dkt. 1, ¶ 17; Dkt. 1-2; Dkt. 1-3; Dkt. 6, ¶ 17.)

23. River City failed to pay the premium it owed for each of the Insurance Contracts in July 2017, however. (Dkt. 1, ¶ 18; Exh. D, ¶ 12)

24. Therefore, by separate Notices dated July 11, 2017, Penn National wrote to River City and informed it that because of River City's failure to pay the premiums due, each of the Insurance Contracts would be canceled effective July 31, 2017, at 12:01 a.m. (Dkt. 1, ¶ 19; Exh. D, ¶ 13.)

25. Copies of the Notices of Cancellation issued to River City are appended to Penn National's Complaint as Exhibits "3" and "4," respectively. (Dkt. 1, ¶ 20; Dkt. 1-4; Dkt. 1-5; Exh. D, ¶ 14)

26. Those Notices further advised River City that if it wished to keep the Insurance Contracts in effect, River City would have to pay the premiums it owed by July 31, 2017. (See Dkt. 1, ¶ 21; Dkt. 1-4; Dkt. 1-5; Exh. D, ¶ 15)

27. River City did not pay the premiums it owed, and both Insurance Contracts were therefore cancelled effective July 31, 2017. (Dkt. 1, ¶ 22; Exh. D, ¶ 16.)

28. Branch, by and through its counsel, has reported to River City that the water infiltration alleged in the Underlying Action was first detected at the Project "six months after the certificate of occupancy" was issued for the Project. (Dkt. 1, ¶ 46; Dkt. 1-7; Exh. A, no. 1; Exh. B, no. 1, attachment 1, 9/18/2020 1:05 p.m. email fr. K. Hardt to R. Policano; Exh. C; Exh. E.

29. The certificate of occupancy was issued on April 5, 2017. (Dkt. 1, ¶¶ 46-48; Dkt. 1-7; Dkt. 6, ¶¶ 47-48; Exh. A, no. 2; Exh. B, no. 2, attachment 2.)

30. Thus, there was no alleged "property damage" at the Project in the form of water infiltration or water damage until late September, 2017, or early October, 2017. (Dkt. 1, ¶¶ 46, 49; Dkt. 1-7; Exh. A, no. 1; Exh. B, no. 1, attachment 1, 9/18/2020 1:05 p.m. email fr. K. Hardt to R. Policano & no. 2, attachment 2; Exh. C; Exh. E.)

31. At the very least, the alleged property damage did not manifest itself until October 2017. (Dkt. 1, ¶ 50; Dkt. 1-7; Dkt. 1, ¶¶ 46, 49; Dkt. 1-7; Exh. A, no. 1; Exh. B, no. 1,attachment 1, 9/18/2020 1:05 p.m. email fr. K. Hardt to R. Policano & no. 2, attachment 2; Exh. C; Exh. E.)

32. The CGL Contract defines the outermost scope of insurance coverage, in part, by providing that the insurance granted under it "applies to . . . 'property damage' only if . . . [t]he . . . 'property damage' occurs during the policy period." (Dkt. 1, ¶ 52; Dkt. 1-2 (form CG 00 01 0413), sec. I.A.1.b(2), ECF p. 22 of 70; Exh. D, ¶ 8)

33. The Umbrella Contract provides that the insurance granted under it also "applies to . . . 'property damage' only if . . . [t]he . . . 'property damage' occurs during the policy period." (Dkt. 1, ¶ 54; Dkt. 1-3 (form 71 1184 1116), sec. I.A.1.c(2), ECF p. 24 of 64; Exh. D, ¶ 10.)

34. Both of the Insurance Contracts define "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions. An accident shall include 'property damage' to other than 'your work' arising from 'your work'." (Dkt. 1-2 (End.

form 71 1403 1116), sec. I.13, ECF p. 59 of 70; Dkt. 1-3 (End. form 71 1422 0311), sec. V.16, ECF p. 52 of 64); Exh. D, ¶¶ 8, 10.)

35. Both Insurance Contracts define "your work" as "[w]ork or operations performed by [River City] or on [its] behalf . . . and . . . [m]aterials, parts or equipment furnished in connection with such work or operations," including "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work', and . . . [t]he providing of or failure to provide warnings or instructions."    (Dkt. 1, ¶¶ 76-77, 80-81; Dkt. 1-2 (form CG 00 01 0413), sec. V.22, ECF p. 40 of 70; Dkt. 1-3 (form 71 1184 1116), sec. V.30, ECF p. 47 of 64; Exh. D, ¶¶ 8, 10.)

36. As defined in the Insurance Contracts, "property damage" means, in part, "[p]hysical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it."  (Dkt. 1-2 (form CG 00 01 0413), sec. V.17.a, ECF p. 39 of 70; Dkt. 1-3 (form 71 1184 0909), sec. V.21.a, ECF p. 46 of 64; Exh. D, ¶¶ 8, 10.)

37. The Insurance Contracts provide that the insurance granted under them "does not apply to . . . '[p]roperty damage' to 'impaired property' or property that has not been physically injured, arising out of . . . [a] defect, deficiency, inadequacy or dangerous condition in . . . 'your work' . . . or . . . [a] delay or failure by [River City] or anyone acting on [River City's] behalf to perform a contract or agreement in accordance with its terms." (Dkt. 1, ¶¶ 75, 79; Dkt. 1-2 (form CG 00 01 0413), sec. I.A.2.m, ECF p. 27 of 70; Dkt. 1-3 (form 71 1184 1116), sec. I.A.2.p, ECF p. 28 of 64; Exh. D, ¶¶ 8, 10)

38. Both Insurance Contracts define "impaired property" to mean "tangible property, other than . . . 'your work', that cannot be used or is less useful because . . . [i]t incorporates . . . 'your work' that is known or thought to be defective, deficient, inadequate or dangerous . . . or . . . [because River City] ha[s] failed to fulfill the terms of a contract . . . if such property can be restored to use by . . . [t]he repair, replacement, adjustment or removal of . . . 'your work'. . . ." (Dkt. 1, ¶¶ 78, 80; Dkt. 1-2 (form

CG 00 01 0413), sec. V.8, ECF p. 37 of 70; Dkt. 1-3 (form 71 1184 1116), sec. V.10, ECF p. 43 of 64;

Exh. D, ¶¶ 8, 10)

39. The Insurance Contracts provide that the insurance granted under them "does not apply to . . .

'[p]roperty damage' to 'your work' arising out of it or any part of it and included in the 'products-

completed operations hazard'." (Dkt. 1, ¶¶ 92, 94; Dkt. 1-2 (form CG 00 01 0413), sec. I.A.2.l, ECF

p. 27 of 70; Dkt. 1-3 (form 71 1184 1116), sec. I.A.2.o, ECF p. 28 of 64; Exh. D, ¶¶ 8, 10)

40. Both of the Insurance contracts define "products-completed operations hazard" to "[i]nclude[ ]

all . . . 'property damage' occurring away from premises [River City] own[s] or rent[s] and arising out

of . . . 'your work' except . . . [w]ork that has not yet been completed or abandoned. . . . Work that may

need service . . . correction, repair or replacement but which is otherwise complete will be treated as

completed." (Dkt. 1, ¶¶ 93, 95; Dkt. 1-2 (form CG 00 01 0413), sec. V.16.a, ECF p. 39 of 70; Dkt. 1-3

(form 71 1184 1116), sec. V.20.a(2), ECF pp. 45-46 of 64; Exh. D, ¶¶ 8, 10.)

41. The Insurance Contracts generally exclude from the insurance provided under them "'property

damage' for which the insured is obligated to pay damages by reason of the assumption of liability in

a contract or agreement." (Dkt. 1, ¶¶ 116, 119; Dkt. 1-2 (form CG 00 01 0413), sec. I.A.2.b, ECF p. 23

of 70; Dkt. 1-3 (form 71 1184 1116), sec. I.A.2.b, ECF p. 25 of 64; Exh. D, ¶¶ 8, 10)

42. Excepted from that exclusion is "liability for damages . . . [a]ssumed in a contract or agreement

that is an 'insured contract'. . . ." (Dkt. 1, ¶¶ 117, 120; Dkt. 1-2 (form CG 00 01 0413), sec. I.A.2.b(2),

ECF p. 23 of 70; Dkt. 1-3 (form 71 1184 1116), sec. I.A.2.b(2), ECF p. 25 of 64; Exh. D, ¶¶ 8, 10.)

43. The Insurance Contracts define "insured contract" to include "[t]hat part of any . . . contract or

agreement pertaining to [River City's] business . . . under which [it] assume[s] the tort liability of

another party to pay for . . . 'property damage' to a third person or organization, provided the . . .

'property damage' is caused, in whole or in part, by [River City] or by those acting on [its] behalf.

However, such part of a contract or agreement shall only be considered an 'insured contract' to the

extent [River City's] assumption of the tort liability is permitted by law. Tort liability means a liability

that would be imposed by law in the absence of any contract or agreement." (Dkt. 1, ¶¶ 118, 121; Dkt. 1-2 (End. form CG 24 26 0413), sec. f, ECF p. 50 of 70; Dkt. 1-3 (End. form 71 1882 1116), sec. 9.g, ECF p. 57 of 64; Exh. D, ¶¶ 8, 10.)

I.  VIRGINIA LAW GOVERNS THE INSURANCE CONTRACTS' INTERPRETATION AND APPLICABILITY, WHICH IS A QUESTION OF LAW FOR THE COURT

The first question to be addressed is the body of substantive law governing the Insurance Contracts' interpretation and applicability. The law of the forum state provides the choice-of-law rules which a federal district court must follow to determine the substantive law governing a particular dispute. *See CACI Int'l, Inc. v. St. Paul Fire & Mar. Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009), *cit'g Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). This Court therefore applies Virginia's choice-of-law rules applicable to disputes over insurance contracts.

Virginia adheres to the *lex loci contractus* principle for determining the body of law that governs an insurance contract's interpretation. Under that principle, "the law of the place where an insurance contract is written and delivered controls issues as to its coverage." *Buchanan v. Doe*, 431 S.E.2d 289, 291 (Va. 1993); *see CACI Int'l*, 566 F.3d at 154-55. As shown in the Insurance Contracts' respective Declarations, each contract was delivered to River City at its office address in Henrico, Virginia. (Dkt. 1-2, ECF p. 3 of 70; Dkt. 1-3, ECF p. 2 of 64; Exh. D, ¶¶ 8, 10.) Thus, under the controlling choice-of-law rules, Virginia law governs the Insurance Contracts' interpretation.

A.  **Virginia Applies the "Eight Corners Rule" to Determine an Insurer's Duty to Defend**

In Virginia, "only the allegations in the complaint and the provisions of the insurance policy are to be considered in deciding whether there is a duty on the part of the insurer to defend and indemnify the insured." *AES Corp. v. Steadfast Ins. Co.*, 725 S.E.2d 532, 535 (Va. 2012). This principle has become known as the "'eight-corners rule' because the determination is made by comparing the 'four corners' of the underlying complaint with the 'four corners' of the policy, to determine whether the

allegations in the underlying complaint come within the [insurance] coverage provided by the policy." *Id.*

Under the eight-corners rule, the "insurer's duty to defend is broader than the obligation to pay, and arises whenever the complaint alleges facts and circumstances, some of which would, if proved, fall within the risk covered by the policy." *Id.* (int'l punct. & cits. omit'd). But if "it appears clearly that the insurer would not be liable under its contract for any judgment based upon the allegations, it has no duty even to defend." *Id.* at 535-36. *See Liberty U., Inc. v. Citizens Ins. Co. of Am.*, 792 F.3d 520, 529 (4th Cir. 2015) ("if it appears clearly that the insurer would not be liable under its contract for any judgment based upon the allegations," the insurer is relieved of the duty to defend).

Nevertheless, in many states[6] that follow the eight-corners rule (or the similar "potentiality" rule) in determining the duty to defend, "declaratory judgment may be entered simultaneously as to both the duty to defend and the duty to pay when the case is based on such issues as nonpayment of a premium [or] cancellation of a policy. . . ." *Madden v. Cont'l Cas. Co.*, 922 S.W.2d 731, 734 (Ark. Ct. App. 1996) (cit. omit'd). *See Rutland v. State Farm Mut. Auto. Ins. Co.*, 426 Fed. Appx. 771, 774 (11th Cir. 2011); *Union Ins. Co. v. Soleil Group, Inc.*, 465 F. Supp.2d 567, 574 n.2 (D.S.C. 2006); *Patrons Oxford Mut. Ins. Co. v. Garcia*, 707 A.2d 384, 386 (Me. 1998). "The rationale for these exceptions is that the coverage dispute depends entirely on the relationship between the insurer and the insured, not on facts to be determined in the underlying litigation." *Union Insurance*, 465 F. Supp.2d at 574 n.2.

In such cases, extrinsic evidence may be considered by the court to determine whether the insured and the insurer stood in a contractual relationship at the time of the alleged loss or "occurrence." *See OneBeacon American Ins. Co. v. Johnny's Selected Seeds, Inc.*, No. 1:12cv375, 2014 U.S. Dist. LEXIS 53098, *27 (D. Me. Apr. 17, 2014), *cit'g North East Ins. Co. v. Young*, 26 A.3d 794, 799 (Me. 2011) (add'l cits. omit'd). *See also Pa. Nat'l Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d 106, 114 (4th Cir. 2012)

---

[6]    No decisions in Virginia appear to have specifically addressed the effect on the eight-corners analysis of an insurance contract's cancellation prior to a loss or "occurrence."

("an insured purchases an insurance policy to indemnify it against injuries occurring within the policy period, not injuries occurring outside the period").

## B.  An Insurance Contract's Interpretation Presents a Question of Law for the Court

The insured bears the burden to prove insurance coverage. Only after the insured makes a *prima facie* showing of coverage can any burden of persuasion pass to the insurer.  *See Erie Ins. Exchange v. Meeks*, 288 S.E.2d 454, 457 (Va. 1982).  Thus, the "insured has the initial burden to establish a duty to defend. . . ." *Liberty U.*, 792 F.3d at 528 (int'l punct. omit'd). "Under Virginia law, the interpretation of a contract – and an insurance contract in particular – presents a question of law." *Minnieland Private Day School, Inc. v. Applied U'writers Captive Risk Assur. Co., Inc.*, 867 F.3d 449, 458 (4th Cir. 2017)*, cit'g PBM Nutritionals, LLC v. Lexington Ins. Co.*, 724 S.E.2d 707, 712 (Va. 2012).

Virginia "courts interpret insurance policies, like other contracts, in accordance with the intention of the parties gleaned from the words they have used in the document." *Transcontinental Ins. Co. v. RBMW, Inc.*, 551 S.E.2d 313, 318 (Va. 2001). The courts accord terms not defined in an insurance contract their "ordinary and accepted meaning." *Lower Chesapeake Assocs. v. Valley Forge Ins. Co.*, 532 S.E.2d 325, 330 (Va. 2000). Under Virginia law, an insurance

> contract is to be construed as a whole, and effect given to every provision thereof if possible.
> No word or paragraph can be omitted in construing the contract if it can be retained and a
> sensible construction given to the contract as a whole.  No word or clause is to be treated as
> meaningless if any reasonable meaning consistent with the other parts of the contract can be
> given to it; and no word or clause should be discarded unless the other words used are so
> specific and clear in contrary meaning as to convincingly show it to be a false demonstration.
> The presumption always is that the parties have not used words aimlessly and that no provision
> is merely a superfluity unless it is plainly a repetition. *American Health Ins. Corp. v. Newcomb*,
> 91 S.E.2d 447, 451 (Va. 1956) (cit. omitted).

Furthermore, the "[w]ords used by the parties are to be given their usual, ordinary and popular meaning, unless it can be clearly shown in some legitimate way that they were used in some other sense, and the burden of showing this is always upon the party alleging it." *Id.* Thus, "Virginia strictly adheres to the 'plain meaning' rule, entitling the parties to rely on the express terms of the written agreement." *Pacific Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 143 F.3d 396, 405 (4th Cir. 1998), *cert. den'd*,

525 U.S. 1104 (1999). "[T]his rule means that a judicial interpretation should conform to the plain meaning that reasonable insurers and insureds likely would have attributed to the words." *Erie Ins. Exch. v. EPC MD*, 822 S.E.2d 351, 355 (Va. 2019). Consistent with the plain-meaning rule, "Virginia law recognizes and gives literal effect to . . . policy language that limits [insurance] coverage." *Gay v. Am. Motorists Ins. Co.*, 714 F.2d 13, 16 (4th Cir. 1983).

II.  <u>THE INSURANCE CONTRACTS WERE CANCELLED PRIOR TO THE ALLEGED DAMAGE</u>

The first hurdle that Branch faces in demonstrating a right to insurance benefits for any judgment or settlement it might obtain in the Underlying Action is proving that the Insurance Contracts were in effect at the time of the putative "occurrence" at issue. As the undisputed facts demonstrate, the contracts had been canceled by that time. For at least this reason, summary judgment should be entered in Penn National's favor.

**A.  At least Two Courts in Virginia have held that an Insurance Contract is Implicated only if "Property Damage" First Manifests itself during the Coverage Period**

It is fundamental that "to determine whether an insurer has a duty to defend an insured against a suit, a court must determine whether any of the claims asserted in the suit fall within the policy's scope of coverage." *Morrow Corp. v. Harleysville Mut. Ins. Co.*, 110 F. Supp.2d 441, 447 (E.D. Va. 2000). As is typical in commercial liability insurance contracts, the CGL Contract defines the outermost scope of insurance coverage, in part, by providing that the insurance granted under it "applies to . . . 'property damage' only if . . . [t]he . . . 'property damage' occurs during the policy period."[7] Similarly, the Umbrella Contract provides that the insurance granted under it also "applies to . . . 'property damage' only if . . . [t]he . . . 'property damage' occurs during the policy period."[8] Both of the Insurance Contracts define "occurrence" to mean "an accident, including continuous or repeated exposure to

---

[7]  (Stmt., ¶ 33.)
[8]  (Stmt., ¶ 34.)

substantially the same general harmful conditions.  An accident shall include 'property damage' to other than 'your work' arising from 'your work'."[9]

To determine whether an "occurrence" has taken place during an insurance contract's coverage period, "courts have adopted . . . one of four general 'trigger theories' based on different constructions of a covered 'occurrence' in CGL policies." *Morrow Corp.*, 110 F. Supp.2d at 447.

> Some courts have adopted an "exposure" theory, under which there is a covered "occurrence" and the liability policy is triggered whenever there is exposure to an injury or damage-causing event during the policy period.  Other courts have adopted a "continuous trigger" theory of coverage, under which all insurance policies in effect from the date of the initial exposure to a damage-causing agent, through any period of progressive or continuous damage, and up to the time the damage is discovered, are triggered.  Still other courts have followed a third approach to defining a covered "occurrence" – namely, the "injury-in-fact" theory – under which coverage is triggered when damage actually occurs, regardless of when it is discovered.  And, finally, some courts have adopted the "manifestation" theory, under which coverage is triggered at the time the damage to the property is discovered.  *Id.* at 447-48 (cits. omit'd).

*See also S. W. Heischman, Inc. v. Reliance Ins. Co.*, 30 Va. Cir. 235, 235-36 (Albemarle 1993) ("In most cases, the time of manifestation is an issue of fact for the jury to decide, although summary judgment may be appropriate where the evidence supports only one conclusion") (citing *Prudential-LMI Comm'l Ins. v. Superior Court*, 798 P.2d 1230, 1247 (Cal. 1990)).

As this Court observed more than twenty years ago, the "Supreme Court of Virginia has not yet signaled which of these approaches it will adopt or, indeed, whether it will adopt some other approach to determining what triggers [liability insurance] coverage under occurrence-based CGL policies."[10] *Morrow*, 110 F. Supp.2d at 448.  That observation remains accurate:  the Virginia Supreme Court still has not decided upon a "trigger rule" for liability insurance coverage.  It remains uncertain which "trigger rule" the Virginia Supreme Court might adopt.  There is some authority suggesting that it might adopt the "manifestation" rule, however, as discussed below.

---

[9]    (Stmt., ¶ 35.)
[10]    In *Morrow*, the Court did not forecast which "trigger rule" the Supreme Court of Virginia would adopt, because that was not "the precise question presented" in the case.  *Morrow Corp. v. Harleysville Mut. Ins. Co.*, 110 F. Supp.2d 441, 448 (E.D. Va. 2000).

1.  <u>One Virginia Court has Applied the Manifestation Rule in a Property Damage Claim</u>

Just one Virginia court appears to have grappled with the question of a "trigger rule" in the property damage context, and that court concluded Virginia's Supreme Court would adopt the "manifestation" rule, under which "coverage is triggered at the time the damage to the property is discovered." *Morrow*, 110 F. Supp.2d at 448. In *S. W. Heischman, Inc. v. Reliance Insurance Company*, the Albemarle County Circuit Court adjudicated a dispute over a 46-unit condominium building that had sustained water damage from a problem in the building's air-conditioning system. At issue in the case was whether the builder's risk insurance contract in effect during the building's construction was implicated by the alleged water damage, or whether, instead, the commercial property insurance contract in effect following the construction's completion was implicated. The plaintiffs moved *in limine* asking the court to hold that they did not bear "the burden of proving specifically during which policy period the particular elements of the entire loss might have occurred," and that "instead . . . the burden of proof should rest with the [two insurance companies] . . . to prove and decide between themselves during which policy period the respective losses occurred." *S. W. Heischman*, 30 Va. Cir. at 235-36.

The court denied the plaintiffs' motion. In reaching that decision, the court reviewed the various "trigger rules" applied in different states and in different insurance contexts, and it relied heavily on a series of decisions from California's appellate courts in concluding that the Virginia Supreme Court would adopt the "manifestation" rule if the question came before it. *See id.* at 237-38. The court noted that although "[t]his is a difficult issue, raising many policy concerns, and the lack of Virginia precedent is unfortunate," the guidance of other courts that had considered the question of "trigger" was "instructive in this case." *Id.* at 237. Particularly relying on the California Supreme Court's decision in *Prudential-LMI Commercial Insurance v. Superior Court*, Judge Peatross concluded that "the interests of both consumers and insurers [would] be furthered if insurers are allowed to accurately estimate their liability, and such estimates are much easier to make under a manifestation rule." *Id.* at

239. *See Prudential-LMI*, 798 P.2d at 1246. Thus, because only one of the two insurers involved in the case could have had an insurance contract in effect at the time that the subject loss first manifested, Judge Peatross held there was no need to apportion liability between the insurers, and that it was the plaintiffs' burden to prove when the manifestation occurred. *S. W. Heischman*, 30 Va. Cir. at 241-42.

"In predicting the decision of [a] state's highest court, this Court may consider, inter alia, decisions of lower state courts, canons of construction, restatements of the law, and 'recent pronouncements of general rules or policies by the state's highest court.'" *Payne v. Wyeth Pharms., Inc.*, No. 2:08cv119, 2008 U.S. Dist. LEXIS 91849, *7 (E.D. Va. Nov. 12, 2008)*, quot'g Liberty Mut. Ins. Co. v. Triangle Indus.*, 957 F.2d 1153, 1156 (4th Cir. 1992). *See Faulkner v. Dillon*, 92 F. Supp.3d 493, 498 (W.D. Va. 2015) (same). Thus, the Court can follow *Heischman* as persuasive authority in deciding the "trigger rule" applicable here.

### 2.   The Fourth Circuit has also Adopted the Manifestation Rule in such a Case

The Fourth Circuit, too, has had occasion to consider the various "trigger rules" that have been applied throughout the country, and in a case decided under Maryland law the court concluded that the manifestation rule was the most appropriate. In *Mraz v. Canadian Universal Insurance Company*, the Fourth Circuit considered an appeal from a judgment in the U.S. District Court for the District of Maryland requiring an insurer, Canadian Universal, to defend and indemnify its insureds in a lawsuit arising from the clean-up of hazardous waste.  The key question in the case was whether the waste leakage at issue in the underlying lawsuit had occurred during the subject insurance contract's coverage period – *i.e.*, whether there had been an "occurrence" during the coverage period. *See Mraz v. Canadian Univ'l Ins. Co.*, 804 F.2d 1325, 1326 (4th Cir. 1986). The court noted that to decide when an "occurrence" takes place within the meaning of a liability insurance contract, the "general rule is that 'the time of the occurrence of an accident . . . is not the time the wrongful act was committed but the time when the complaining party was actually damaged.'" *Id.* at 1328*, quot'g U.S. Fid. & Guar. Co. v. Am. Ins. Co.*, 345 N.E.2d 267, 270 (Ind. Ct. App. 1976).

Without elaborating on the various "trigger rules" adopted by different jurisdictions, the Fourth Circuit held that "the better rule is that the occurrence is deemed to take place when the injuries first manifest themselves." *Id.* (citing various authorities). Applying the "manifestation" rule, the court reversed the District of Maryland's judgment, and held that "in hazardous waste burial cases such as this one, the occurrence is judged by the time at which the leakage and damage are first discovered." *Id.* As discussed below, many other courts have reached the same conclusion with respect to other types of alleged property damage – including roof leaks.

### B.  Courts Elsewhere have Explained the Manifestation's Rules Merits, and Applied it

The manifestation rule's numerous advantages in the third-party liability-insurance context – both for insurers and insureds – were detailed at some length in *Pennsylvania National Mutual Casualty Insurance Company v. St. John*, in which the Supreme Court of Pennsylvania explained its reasons for adopting that rule. "First, [the manifestation rule] better protects against injured parties insuring themselves for events which have already taken place. Delaying trigger of coverage until the cause of an injury is reasonably ascertainable would allow a tortfeasor with knowledge of his or her potential liability to shift this burden to an unwary insurance company." *Pa. Nat'l Mut. Cas. Ins. Co. v. St. John*, 106 A.3d 1, 16 (Pa. 2014). "Second, it adds certainty and predictability to a trigger of coverage analysis. Identifying the effects of actual injury is simpler and less involved than tracing injury to its probable cause. Finally, in the event the insurer eventually becomes insolvent, the insured is more likely to obtain coverage as the policy will be triggered at an earlier date, when injury first manifests." *Id.* "Moreover, implicit concerns of fairness and equity do not require that the injured party first discover both the injury and its cause before an injury is deemed to have manifested for purposes of triggering coverage under a policy of third party liability insurance.  Whether coverage is triggered when injury manifests or when both injury and its cause becomes reasonably apparent should make little or no difference to the insured or the third party injured by the insured's conduct. . . ." *Id.* at 16 n.11.

Notably, the manifestation rule has been applied in cases involving liability for roof leaks allegedly resulting from an insured's faulty workmanship or installation (such as the loss at issue in the Underlying Action). In just such a context, the Florida District Court of Appeal for the First District has held that in order to implicate insurance coverage under an "occurrence"-based policy, "an identifiable event *other than the causative negligence* must take place during the policy period," because the "term 'occurrence' is commonly understood to mean *the event in which negligence manifests itself in property damage or bodily injury*. . . ." *Travelers Ins. Co. v. C. J. Gayfer's & Co.*, 366 So.2d 1199, 1202 (Fla. Ct. App. 1979) (emphs. supp'd). The court further reasoned that "[i]nsurance contracts commonly provide coverage for a specified period of time," and an "insured would expect to find a time limitation expressed in the policy, and would not reasonably assume, after reading only the [policy's] completed operations definition, that he could cease paying premiums but enjoy completed operations coverage indefinitely." *Id.* at 1201. The court therefore reversed the trial court's entry of summary judgment for the insured, as the rooftop drainage system at issue failed three months after the subject insurance contract expired, though the insurance contract had been in effect when the insured performed its work. *See id.* In other words, no property damage manifested itself during the policy period so as to qualify as an "occurrence" during that period.

Much more recently, the U.S. District Court for the Northern District of Alabama applied that state's law to the question of "trigger" in connection with an insured's alleged liability for a leaking roof and held that the determinative question was when the alleged damage first manifested – not when the insured's work was performed. In *Auto-Owners Insurance Company v. Wier-Wright Enterprises*, the court noted that the plaintiffs in the underlying action had alleged water damage to their home beginning in February, 2013, from a roof leak allegedly "caused by the negligence, wantonness, and incompetence of" the insured and a co-defendant. *Auto-Owners Ins. Co. v. Wier-Wright Enterprises*, No. 5:15cv1118, 2017 U.S. Dist. LEXIS 37477, *8 (N.D. Ala. Mar. 16, 2017). The insurance policy

at issue had expired one year earlier, in February, 2012.  *See id.*, *11.  That policy had been in effect at the time the insured performed the work in question, however.  *See id.*, *19-*20.

As the U.S. District Court observed, "in determining the timing of an 'occurrence' for insurance coverage purposes, the relevant inquiry is when the property damage took place, not when the underlying work was performed. . . . Simply put, 'as a general rule the time of an 'occurrence' of an accident within the meaning of an insurance policy ***is not the time the wrongful act was committed but the time the complaining party was actually damaged.***"  *Id.*, *34-*35 (orig'l emph.)*, quot'g Cincinnati Ins. Co. v. Amerisure Ins. Co.*, No. 11-271, 2012 U.S. Dist. LEXIS 129953, *36-*37 (S.D. Ala. Sept. 12, 2012) (int'l cits. omit'd).  Because the plaintiffs in the underlying lawsuit did not detect water leaks until a year after the insurance contract at issue had expired, the court held that there had not been an "occurrence" within the coverage period, and the insurer did not have a duty to defend or indemnify its insured against the plaintiffs' claims.  *See id.*, *41.

### C.  <u>The Alleged Water Damage Manifested *after* the Insurance Contracts Expired</u>

Under the Insurance Contracts, Penn National agreed to insure River City subject to the contracts' respective terms, conditions, limitations and exclusions.[11]  Among those terms and conditions was the requirement that River City pay premiums to Penn National in consideration for the insurance provided to River City under the Insurance Contracts.[12]  River City failed to pay the premium it owed for each of the Insurance Contracts in July 2017.[13]  Therefore, by separate Notices dated July 11, 2017, Penn National wrote to River City and informed it that because of River City's failure to pay the premiums due, each of the Insurance Contracts would be canceled effective July 31, 2017, at 12:01 a.m.[14]  Those Notices further advised River City that if it wished to keep the Insurance Contracts in effect, River City

---

[11]  (Stmt., ¶ 22.)
[12]  (Stmt., ¶ 23.)
[13]  (Stmt., ¶ 24.)
[14]  (Stmt., ¶¶ 25-26.)

would have to pay the premiums it owed by July 31, 2017.[15]  River City did not pay the premiums it owed, however, and both Insurance Contracts were therefore cancelled effective July 31, 2017.[16]

As is typical in commercial general liability insurance contracts, the CGL Contract provides that the insurance granted under it "applies to . . . 'property damage' only if . . . [t]he . . . 'property damage' occurs during the policy period."[17]  Similarly, the Umbrella Contract provides that the insurance granted under it also "applies to . . . 'property damage' only if . . . [t]he . . . 'property damage' occurs during the policy period."[18]  As the undisputed facts show, the water damage or leakage alleged in the Underlying Action was first discovered in October, 2017 – three months *after* the Insurance Contracts' cancellation.

There is no dispute that the water infiltration alleged in the Underlying Action was first detected at the Project "six months after the certificate of occupancy" had been issued for the Project.[19]  The certificate of occupancy was issued on April 5, 2017.[20]  Thus, there was no alleged "property damage" at the Project until October 2017.[21]  At the very least, the alleged property damage at the Project did not manifest itself until October 2017.[22]

Based on these facts, it is clear beyond peradventure that the alleged water damage was not observed until after the Insurance Contracts were cancelled – in other words, ***the alleged damage first manifested some three months after*** the Insurance Contracts' cancellation. If the Court concludes that the Supreme Court of Virginia would apply the "manifestation" rule here,[23] then under that rule as applied by *S. W. Heischman*, by *Mraz*, and other courts, the Underlying Action does not involve an

---

[15]    (Stmt., ¶ 27.)
[16]    (Stmt., ¶ 28.)
[17]    (Stmt., ¶ 33.)
[18]    (Stmt., ¶ 34.)
[19]    (Stmt., ¶ 29.)
[20]    (Stmt., ¶ 30.)
[21]    (Stmt., ¶ 31.)
[22]    (Stmt., ¶ 32.)
[23]    Even if the Court concludes that the Supreme Court of Virginia would apply a different "trigger" rule, River City would still have to prove there was "property damage" during the coverage period – and there is no such evidence.

"occurrence" within the Insurance Contracts' coverage period.  Because "declaratory judgment may be entered simultaneously as to both the duty to defend and the duty to pay when the case is based on such issues as nonpayment of a premium [or] cancellation of a policy," *Madden*, 922 S.W.2d at 734, and because River City has constructively admitted the facts material to the question of whether the water damage alleged in the Underlying Action occurred within the Insurance Contract's coverage period, *Ryan*, 253 F.3d at 780, the Claim does not involve "property damage" occurring during that coverage period.  As the Insurance Contracts "appl[y] to . . . 'property damage' only if . . . [t]he . . . 'property damage' occurs during the policy period",[24] Penn National has no duty to defend or indemnify River City in connection with the Claim and the Underlying Action.  For at least that reason, summary judgment should be entered in Penn National's favor.

## III. THE INSURANCE CONTRACTS DO NOT REQUIRE PENN NATIONAL TO PAY FOR THE REPLACEMENT OR REPAIR OF RIVER CITY'S FAULTY WORK

Furthermore, even assuming the Claim and the Underlying Action resulted from "property damage" occurring within the Insurance Contract's coverage period (they did not), there can be no question that River City's allegedly faulty work, at least, is not insured.  For this further reason, at least partial summary judgment should be entered in Penn National's favor.

### A.  **The Insurance Contracts do not Insure the Repair or Replacement of Faulty Work**

The CGL Contract defines "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions. An accident shall include 'property damage' to other than 'your work' arising from 'your work'."[25]  The Umbrella Contract defines "occurrence" in identical terms.[26]  Both contracts define "your work" as "[w]ork or operations performed by [River City] or on [its] behalf . . . and . . . [m]aterials, parts or equipment furnished in

---

[24] (Dkt. 1, ¶ 52; Dkt. 1-2 (form CG 00 01 0413), sec. I.A.1.b(2), ECF p. 22 of 70; Dkt. 1, ¶ 54; Dkt. 1-3 (form 71 1184 1116), sec. I.A.1.c(2), ECF p. 24 of 64.)

[25] (Stmt., ¶ 35.)

[26] (Stmt., ¶ 35.)

connection with such work or operations," including "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work', and . . . [t]he providing of or failure to provide warnings or instructions."[27] "Property damage" means, in part, "[p]hysical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it."[28]

These interrelated definitions make clear that "property damage" for which liability insurance is granted under the Insurance Contracts is limited to physical injury to tangible property ***other than*** the insured's own work – thereby defining "occurrence" consistently with that term's interpretation under controlling Virginia law. *See Dragas Mgmt. Corp. v. Hanover Ins. Co.*, 798 F. Supp.2d 758, 763 (E.D. Va. 2011); *Catalina London Ltd. v. Am. Invs. Real Estate Corp.*, No. 1:10cv983, 2011 U.S. Dist. LEXIS 99718, *7-*8 (E.D. Va. Aug. 31, 2011).

### B. The Underlying Action Alleges Damage to River City's Work

In the Underlying Action, Branch alleges once the Project was completed, Genesis asserted the Project was not "constructed in accordance with approved . . . plans, drawings, and specifications," that River City had employed "defective workmanship and materials," and that River City was negligent "in the selection of materials and building techniques used" in the Project.[29] Genesis allegedly claimed River City had failed to construct or supply the Project's roof, and its aluminum and composition siding, "in accordance with the plans, specifications, and industry standards," and also that River City "was negligent, and, as a result, there was water intrusion and property damage to the" Project.[30] Branch further alleges that it "undertook to repair the damages to the [Project] and the property damages sustained by Genesis. . . ."[31]

---

[27] (Stmt., ¶ 36.)
[28] (Stmt., ¶ 37.)
[29] (Stmt., ¶ 12.)
[30] (Stmt., ¶ 13.)
[31] (Stmt., ¶ 15.)

Based on these and other allegations, Branch contends that River City breached certain terms in its subcontractor agreement with Branch, *inter alia*, "by providing defective materials and/or workmanship on the Project."[32]  Branch avers that it has sustained certain damages in the form of monetary expenditures for repairing or remediating River City's purported breaches of contract, which it seeks to recover from River City in the Underlying Action.[33]  Branch alleges as well that River City breached an implied warranty on the quality of River City's materials and workmanship "by providing defective materials and/or workmanship on the Project," and it avers that it has sustained damages in the form of monetary expenditures as a result of River City's alleged breach of implied warranty, which it also seeks to recover in the Underlying Action.[34]

### C. Branch's Alleged Repair/Replacement of River City's Work it not an "Occurrence"

As discussed above, both Insurance Contracts define an "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions," and an "accident" even "include[s] 'property damage' to ***other than 'your work'*** arising from 'your work'"[35] (emph. supp'd).  Thus, "all[36] roofing work and all aluminum and composition siding at the Project" – ***all*** of which River City allegedly was hired to install – were the product of River City's alleged "defective workmanship and materials," and those aspects of the Project, therefore, do not qualify as tangible property "other than [River City's] 'work'" that are included within the Insurance Contracts' definition of "property damage" resulting from an "occurrence":  "an accident, including continuous or repeated exposure to substantially the same general harmful conditions.  An accident shall include 'property damage' ***to other than 'your work'*** arising from 'your work'"[37] (emph. supp'd).

---

[32]   (Stmt., ¶ 19.)
[33]   (Stmt., ¶ 20.)
[34]   (Stmt., ¶ 21.)
[35]   (Stmt., ¶ 35.)
[36]   "A more comprehensive word than 'all' cannot be found in the English language." *United States v. Crisp*, 817 F.2d 256, 259 (4th Cir. 1987), *cit'g Moore v. Va. Fire & Marine Ins. Co.*, 69 Va. (28 Gratt.) 508, 516 (1877).
[37]   (Stmt., ¶ 35)

Because all of the Project's roof and all of the Project's aluminum and composition siding comprised River City's allegedly faulty "work," the repair and replacement of the roof and siding does not constitute "property damage" caused by an "occurrence," and Penn National has no obligation to indemnify River City, Branch, and/or anyone else in connection with the costs of such repair and replacement. For this reason, at least partial summary judgment should be entered in Penn National's favor.

## IV. THE INSURANCE CONTRACTS' "IMPAIRED PROPERTY" EXCLUSIONS APPLY

Regardless of whether the Underlying Action otherwise implicated the Insurance Contracts (it does not), any possible liability that Penn National might have to River City (as well as Branch) in connection with that lawsuit is limited or excluded under the Insurance Contracts' respective "impaired property" exclusions. For this further reason, the Motion should be granted.

As detailed above, Branch alleges the Project was not "constructed in accordance with approved . . . plans, drawings, and specifications" because River City employed "defective workmanship and materials," and because River City was negligent "in the selection of materials and building techniques used" in the Project.[38] River City allegedly failed to construct or supply the Project's roof, and its aluminum and composition siding, "in accordance with the plans, specifications, and industry standards," and also that River City "was negligent, and, as a result, there was water intrusion and property damage to the" Project.[39] Branch avers that it "undertook to repair the damages to the [Project] and the property damages sustained by Genesis. . . ."[40] As a result, Branch asserts it has sustained certain damages in the form of monetary expenditures, and it alleges as well that River City breached an implied warranty on the quality of River City's materials and workmanship "by providing defective materials and/or workmanship on the Project," and avers that it has sustained damages in the

---

[38] (Stmt., ¶ 12.)
[39] (Stmt., ¶ 13.)
[40] (Stmt., ¶ 15.)

form of monetary expenditures as a result of River City's alleged breach of implied warranty, which it seeks to recover in the Underlying Action.[41]

The Insurance Contracts provide that the insurance granted under them "does not apply to . . . '[p]roperty damage' to 'impaired property' or property that has not been physically injured, arising out of . . . [a] defect, deficiency, inadequacy or dangerous condition in . . . 'your work' . . . or . . . [a] delay or failure by [River City] or anyone acting on [River City's] behalf to perform a contract or agreement in accordance with its terms."[42]  Both Insurance Contracts define "impaired property" to mean "tangible property, other than . . . 'your work', that cannot be used or is less useful because . . . [i]t incorporates . . . 'your work' that is known or thought to be defective, deficient, inadequate or dangerous . . . or . . . [because River City] ha[s] failed to fulfill the terms of a contract . . . if such property can be restored to use by . . . [t]he repair, replacement, adjustment or removal of . . . 'your work'. . . ."[43]

Even assuming that the repair and replacement of River City's allegedly faulty work – the Project's roof and siding – qualified as "property damage" caused by an "occurrence" during the coverage period (and it does not), there can be no question that all of the Project's other tangible property damaged by the alleged water leakage comprises "property damage" "to 'impaired property' . . . arising out of . . . [a] defect, deficiency, inadequacy or dangerous condition in . . . 'your work' . . . or . . . [a] delay or failure by [River City] or anyone acting on [River City's] behalf to perform a contract or agreement in accordance with its terms."[44]  That is because the Project – other than its roof and siding, which were River City's "work" – meets the definition of "impaired property":  "tangible property, other than . . . [River City's] 'work', that cannot be used or is less useful because . . . [i]t incorporates . . . [River City's] 'work' that is known or thought to be defective, deficient, inadequate or dangerous . . . or . . .

---

[41] (Stmt., ¶ 20.)
[42] (Stmt., ¶ 38.)
[43] (Stmt., ¶ 39.)
[44] (Stmt., ¶ 38.)

[because River City] ha[s] failed to fulfill the terms of a contract . . . if such property can be restored to use by . . . [t]he repair, replacement, adjustment or removal of . . . [River City's] 'work'. . . ."[45]

***The restoration of the Project to use by the repair and replacement of River City's work, at Branch's expense, is precisely what Branch alleges in the Underlying Action***.[46]  Branch's alleged costs for repairing and restoring the Project's damage caused by River City's work is precisely the sort of damage excluded from coverage by the Insurance Contracts' "impaired property" exclusions.[47]  *See Schnabel Found. Co. v. Nat'l Union Fire Ins. Co.*, 780 Fed. Appx. 5, 12 (4th Cir. 2019) (Md.) (unpub'd) (the apartment-construction project on which the insured allegedly performed defective work was "impaired property" because it incorporated the insured's work, and the property damage the project sustained from that work in the form of repairs and remediation was therefore barred under the exclusion); *Gentry Mach. Works, Inc. v. Harleysville Mut. Ins. Co.*, 621 F. Supp.2d 1288, 1297 (M.D. Ga. 2008) (boilers installed by the insured were "impaired property" damaged by the insured's faulty installation of pedestals to support the boilers, and the boiler damage was therefore excluded). Thus, for this further reason, summary judgment should be entered in Penn National's favor.

V.  THE INSURANCE CONTRACTS' "YOUR WORK" EXCLUSIONS BAR THE CLAIM

Additionally, for reasons similar to those discussed above, Penn National is relieved under the Insurance Contracts' "your work" exclusions from any defense and indemnity obligations it otherwise might have to River City and/or to Branch.  For this reason, too, the Motion should be granted.

The Insurance Contracts provide that the insurance granted under them "does not apply to . . . '[p]roperty damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard'."[48]  Both contracts define "products-completed operations hazard" to

---

[45]  (Stmt., ¶ 39.)
[46]  (Stmt., ¶¶ 15, 20-21.)
[47]  *See Gentry Mach. Works, Inc. v. Harleysville Mut. Ins. Co.*, 621 F. Supp.2d 1288, 1294 (M.D. Ga. 2008) ("The 'your work', 'your product', 'impaired property', and 'recall' exclusions are often characterized as 'business risk' exclusions.  The purpose of 'business risk' exclusions is to ensure that liability for faulty or defective workmanship is properly allocated between the insurer and the insured").
[48]  (Stmt., ¶ 40.)

"[i]nclude[ ] all . . . 'property damage' occurring away from premises [River City] own[s] or rent[s] and arising out of . . . 'your work' except . . . [w]ork that has not yet been completed or abandoned. . . . Work that may need service . . . correction, repair or replacement but which is otherwise complete will be treated as completed."[49]

The Underlying Action alleges that River City served as a subcontractor for the Project and was responsible for "all roofing work and all aluminum and composition siding at the Project. . . ."[50]  After the Project was completed, Genesis claimed to have discovered "substantial structural and material defects" in it, that the Project was not "constructed in accordance with approved . . . plans, drawings, and specifications," that River City had employed "defective workmanship and materials," and that River City was negligent "in the selection of materials and building techniques used" in the Project.[51]

Branch alleges that Genesis has claimed River City failed to construct or supply the Project's roof, aluminum and composition siding "in accordance with the plans, specifications, and industry standards," and also that River City "was negligent, and, as a result, there was water intrusion and property damage to the" Project.[52]  The Project was completed before the alleged property damage and water intrusion occurred, and/or before the alleged property damage and water intrusion first manifested.[53]  River City's work on the Project's roof and siding therefore falls within the Insurance Contracts' respective "products-completed operations hazards": "'property damage' occurring away from premises [River City] own[s] or rent[s] and arising out of . . . [River City's] 'work' except . . . [w]ork that has not yet been completed or abandoned. . . ."[54]

Under the Insurance Contracts' respective "your work" exclusions, therefore, any and all damage to River City's work on the Project – the roof and the siding – is excluded from the insurance provided

---

[49]   (Stmt., ¶ 41.)
[50]   (Stmt., ¶ 11.)
[51]   (Stmt., ¶ 12.)
[52]   (Stmt., ¶ 13.)
[53]   (Stmt., ¶¶ 28-32.)
[54]   (Stmt., ¶ 41.)

under the Insurance Contracts.  "The primary purpose of the 'your work' exclusion[ ] is to prevent general commercial liability policies from insuring against an insured's own faulty workmanship, which is a normal risk associated with operating a business."  *Builders Mut. Ins. Co. v. J. L. Albrittain, Inc.*, No. 1:19cv1315, 2020 U.S. Dist. LEXIS 81211, *23 (E.D. Va. May 7, 2020) (int'l punct. omit'd)*, cit'g Jessco, Inc. v. Builders Mut. Ins. Co.*, 472 Fed. Appx. 225, 229 (4th Cir. 2012).  For this additional reason, therefore, at least partial summary judgment should be entered in Penn National's favor.

VI. THE "CONTRACTUAL LIABILITY" EXCLUSIONS ALSO BAR THE CLAIM

Additionally, the Claim also falls within the Insurance Contract's respective "contractual liability" exclusions, and the Motion should be granted for that further reason, as well.  The Insurance Contracts generally exclude from the insurance provided under them "'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement."[55] Excepted from that exclusion is "liability for damages . . . [a]ssumed in a contract or agreement that is an 'insured contract'. . . ."[56]  The Insurance Contracts define "insured contract" to include "[t]hat part of any . . . contract or agreement pertaining to [River City's] business . . . under which [it] assume[s] the tort liability of another party to pay for . . . 'property damage' to a third person or organization, provided the . . . 'property damage' is caused, in whole or in part, by [River City] or by those acting on [its] behalf.  However, such part of a contract or agreement shall only be considered an 'insured contract' to the extent [River City's] assumption of the tort liability is permitted by law. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement."[57]

Branch has alleged that it served as the general contractor for the Project.  (Stmt., ¶ 7.)  Following completion of work on the Project and the alleged discovery of water infiltration and property damage there, Branch, "[p]ursuant to its contractual and legal obligations with Genesis . . . undertook to repair

---

[55]  (Stmt., ¶ 42.)
[56]  (Stmt., ¶ 43.)
[57]  (Stmt., ¶ 44.)

the damages to the Apartments and the property damages sustained by Genesis. . . ."[58]  "Pursuant to its contractual and/or legal obligations with Genesis, Branch also paid (or will pay) Genesis other damages associated with the property damage at the of [*sic*] of the Apartments."[59]  Branch has alleged that River City contractually agreed to defend or indemnify Branch from Genesis' claims and demands, and that River City is therefore contractually liable to it to indemnify it for the costs Branch allegedly has incurred in performing its "contractual and legal" duties to Genesis.[60]

But any ***contractual*** liability that Branch might have had to Genesis does not qualify as "tort liability" – a liability that would be imposed by law ***in the absence of any contract or agreement*** – and, therefore, such contractual liability is not exempted from the Insurance Contracts' respective contractual-liability exclusions.[61]  The key is the source of Branch's alleged duty to Genesis:  Branch avers that it paid (and/or will pay) Genesis for "damages associated with the property damage at" the Project, "***[p]ursuant to [Branch's] contractual and/or legal obligations with Genesis***. . . ."[62] (emph. supp'd).  That allegation (and binding admission) reveals the nature of Branch's alleged liability to Genesis:  it was **contractual**, and not a liability imposed by law in the absence of a contract or agreement. *See Tingler v. Graystone Homes, Inc.*, 834 S.E.2d 244, 254 (Va. 2019) ("In determining whether a cause of action sounds in tort, contract, or both, 'the source of the duty violated must be ascertained'").  Branch does not allege that it owed a common-law duty to Genesis; rather, it alleges that it owed a *contractual* duty, and it is Branch's alleged expenditures in performing that duty for which it seeks indemnity from River City.

Under the economic-loss doctrine, "claims for damages which were within the contemplation of the parties when framing their agreement – such as economic losses and ***damage to property that is***

---

[58]    (Stmt., ¶ 15.)
[59]    (Stmt., ¶ 16.)
[60]    (Stmt., ¶ 14.)
[61]    (Stmt., ¶ 44.)
[62]    (Stmt., ¶ 15.)

*the subject of the agreement* – remain 'the particular province of the law of contracts.'" *Id.* at 264-65 (emph. supp'd) (int'l punct. & cit. omit'd).  Branch does ***not*** seek indemnity from River City for tort liability – "a liability that would be imposed by law in the absence of any contract or agreement" – but, rather, for Branch's contractual liability to Genesis.  Therefore, the alleged indemnity agreement between Branch and River City does not qualify as an "insured contract," and the contractual liability exclusion bars the Claim.

<u>CONCLUSION</u>

For all of the foregoing reasons, Penn National respectfully prays that the Court grant its Motion, and enter summary judgment in its favor.

Respectfully submitted,

**PENNSYLVANIA NATIONAL MUTUAL
CASUALTY INSURANCE COMPANY**

By:  SETLIFF LAW, P.C.

_____/s/ Kevin T. Streit_____
Of Counsel

Kevin T. Streit (VSB No. 45024)
Allison F. Rienecker (VSB No. 87951)
Sᴇᴛʟɪғғ Lᴀᴡ, P.C.
4940 Dominion Boulevard
Glen Allen, Virginia 23060
(804) 377-1260
(804) 377-1280 (facsimile)
kstreit@setlifflaw.com
arienecker@setlifflaw.com
*Counsel for Pennsylvania National
    Mutual Casualty Insurance Company*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of December, 2021, a true copy of the foregoing was transmitted to the following via the Court's ECF system:

>Kenneth F. Hardt, Esq.
>Sinnott, Nuckols & Logan, P.C.
>13811 Village Mill Road
>Midlothian, Virginia 23114
>khardt@snllaw.com
>*Counsel for Branch Builds, Inc.*

_____/s/ Kevin T. Streit_____
Kevin T. Streit (VSB No. 45024)
SETLIFF LAW, P.C.
4940 Dominion Boulevard
Glen Allen, Virginia 23060
(804) 377-1260
(804) 377-1280 (facsimile)
kstreit@setlifflaw.com
*Counsel for Pennsylvania National Mutual*
*  Casualty Insurance Company*
