**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

PENNSYLVANIA NATIONAL MUTUAL )
  CASUALTY INSURANCE COMPANY, )
             )
     Plaintiff,      )
             )
v.            )  C. A. No. 3:21cv365-HEH
             )
RIVER CITY ROOFING, LLC, *et al.*,  )
             )
     Defendants.    )

**PLAINTIFF'S REPLY TO BRANCH BUILDS, INC.'S OPPOSITION TO PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT**[1]

As provided under Rule 56 of the Federal Rules of Civil Procedure and this Court's Local Rules 7(F) and 56, the plaintiff, Pennsylvania National Mutual Casualty Insurance Company ("Penn National"), by counsel, states the following in reply to defendant Branch Builds, Inc.'s ("Branch," and collectively with Penn National, the "Parties") Opposition (Dkt. 36)[2] to Penn National's motion for summary judgment (Dkt. 33) (the "Motion").

For the reasons set forth herein, as well as those discussed in Penn National's memorandum of law supporting the Motion (Dkt. 34),[3] incorporated herein, by reference,[4] Penn National respectfully renews its request that the Court grant its Motion and enter judgment in its favor.

---

[1] Documents contained in the Court's record of this action are referenced herein by the Court's ECF docket number, and are cited herein as "Dkt. __."

[2] Branch Builds, Inc.'s Opposition (Dkt. 36) is referenced herein as the "Opposition," and is cited herein as "Dkt. 36 at __."

[3] Penn National's memorandum of law supporting the Motion (Dkt. 34) is referenced herein as the "Opening Brief," and is cited herein as "Dkt. 34 at __."

[4] Penn National also incorporates herein, by reference, all terms defined in the Opening Brief, as if those terms were defined herein again, *verbatim.*

## RESPONSE TO BRANCH'S ASSERTION OF DISPUTED MATERIAL FACTS[5]

In contesting a summary-judgment motion, "[t]he opposing party must demonstrate that a triable issue of fact exists. . . ."  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As provided under the Court's Local Rule 56, in "determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues [of material fact] filed in opposition to the motion."  E.D. Va. L. R. 56(B).  A "genuine" issue of material fact is present only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson*, 477 U.S. at 248.

The Opposition does not set forth evidence from the record in this action to try to demonstrate a genuine dispute over any of the material facts set forth in the Opening Brief.[6]  Instead, Branch avers that the Court should simply ignore the undisputed evidence regarding the Insurance Contracts' July 31, 2017 cancellation, on the premise that the "eight corners" analysis that generally governs the determination of an insurer's duty to defend bars that evidence.  (Dkt. 36 at 3-5.)  If the cancellation issue were based upon facts disputed *in the Underlying Action*, Branch would be correct – but that is not the case.  The question of whether the Insurance Contracts remained in effect when the alleged property damage first occurred is not a matter to be decided in the Underlying Action *at all*, and it thus falls outside the eight-corners analysis.  On the contrary, this question relates to the existence (or not) of a contractual relationship between Penn National and its insured, River City Roofing, LLC ("River City"), when the property damage allegedly occurred.  Branch cites no authorities rebutting those cited in the Opening Brief holding that the

---

[5]    The Opening Brief's Statement of Undisputed Material Facts is referenced herein as the "Statement," and is cited as "Dkt 34, Stmt., ¶ __."
[6]    See discussion in section III.E, below.

Court not only can, but should, consider extrinsic evidence on that point, notwithstanding the general preclusion of such evidence.  (Dkt. 34 at 11-12.)

I.   BRANCH FAILS TO SHOW GROUNDS FOR THE COURT TO DECLINE TO FOLLOW THE AUTHORITIES CITED IN THE OPENING BRIEF

In fact, Branch offers no rationale at all (much less supporting authorities) to support its contention that the Court should disregard the undisputed evidence of the Insurance Contracts' cancellation in this instance, where, in part, "the case is based on . . . nonpayment of a premium [and] cancellation of a policy. . . ."  *Madden v. Cont'l Cas. Co.*, 922 S.W.2d 731, 734 (Ark. Ct. App. 1996) (cit. omit'd).  With no controlling law on which to rely, and no evidence in the record to dispute the material facts cited in the Opening Brief, Branch simply points to the eight-corners rule and asks the Court to blindfold itself regarding the Insurance Contracts' pre-damage cancellation.  The Court should not do so.  (Dkt. 36 at 3-5.)

As Penn National observed in the Opening Brief, no decisions in Virginia appear to have specifically addressed the effect on the eight-corners analysis of an insurance contract's cancellation prior to a loss or "occurrence."  (Dkt. 34 at 11 n.6.)  Thus, it is entirely appropriate for the Court to take guidance from authorities elsewhere.  *See Tunnell v. Ford Motor Co.*, 385 F. Supp.2d 582, 585 (W.D. Va. 2005) ("As with any area of law, persuasive authority in the form of case law from other jurisdictions and restatements is instructive in identifying Virginia common law rules").  *See also Long v. CPI Sec. Sys.*, No. 3:12cv396, 2013 U.S. Dist. LEXIS 99063, *8 (W.D.N.C. July 16, 2013); *Finnegan v. United States*, No. 5:15cv3515, 2016 U.S. Dist. LEXIS 138457, *22 n.7 (D.S.C. Aug. 5, 2016).  Thus, the Court can, and should, follow the persuasive reasoning of the authorities set forth in the Opening Brief.  (Dkt. 34 at 11-12.)  *See Union Ins. Co. v. Soleil Group, Inc.*, 465 F. Supp.2d 567, 574 n.2 (D.S.C. 2006) ("The rationale for these exceptions is that the coverage dispute depends entirely on the relationship between the insurer and the insured, not on facts to be determined in the underlying litigation").

Branch attempts to distinguish away the line of authorities cited by Penn National on various grounds. Branch avers that *One Beacon American Ins. Co. v. Johnny's Selected Seeds, Inc.*, should be disregarded because it was decided under Maine law – a point Penn National does not dispute – which allows a court to consider extrinsic evidence on the question of an insurance contract's cancellation. (Dkt. 36 at 13.) Branch fails to note that Maine's standard for determining an insurer's duty to defend, the "pleading comparison test," is materially identical to Virginia's "eight-corners" analysis, as Maine's standard requires "comparing the allegations in the underlying complaint with the provisions of the insurance policy." *One Beacon American Ins. Co. v. Johnny's Selected Seeds, Inc.*, No. 1:12cv375, 2014 U.S. Dist. LEXIS 53098, *23 (D. Me. Apr. 17, 2014). As with Virginia's "eight-corners" analysis, under Maine's standard "[e]vidence beyond the pleadings and the insurance contract – 'extrinsic evidence' – is normally ignored. . . ." *Id.*, *24. Courts in Maine nonetheless recognize that "where an insurer disputes its duties to defend and indemnify 'based on facts that are not related to the question of the insured's liability, such as nonpayment of a premium [or] cancellation of a policy,'" it is appropriate to consider extrinsic evidence on those particular issues. *Id.*, *27, citing *North East Ins. Co. v. Young*, 26 A.3d 794, 799 (Me. 2011). But "[o]utside these narrowly construed exceptions, [Maine courts have] consistently reinforced the 'policy comparison test' to the exclusion of extrinsic evidence." *Id.*, *27-*28, citing *Cox v. Commonwealth Land Title Ins. Co.*, 59 A.3d 1280, 1283 (Me. 2013). In short, Maine law is consistent with Virginia law on determining the duty to defend – and the reasoning of Maine's courts, therefore, carries added weight.

Branch next tries to distinguish *Madden v. Continental Ins. Co.* on the ground that it "did not involve an allegation of non-payment of premium." (Dkt. 36 at 13.) That is true – and it is also immaterial. In *Madden*, the court observed that "[t]here are situations in which declaratory judgment may be granted as to the duty to defend," and it noted that among those situations are instances "when the case is based on such issues as nonpayment of a premium [or] cancellation of

a policy. . . ." *Madden v. Continental Ins. Co.*, 922 S.W.2d 731, 734 (Ark. Ct. App. 1996), citing *Am. Policyholders' Ins. Co. v. Cumberland Cold Storage Co.*, 373 A.2d 247 (Me. 1977). Even though *Madden*'s decision did not turn upon nonpayment of a premium, the court nevertheless recognized that in such an instance it was appropriate to look beyond the eight corners of the insurance contract and the underlying complaint, and to consider evidence relating to the contractual relationship between the insurer and its insured. Here again, the legal principles discussed in *Madden* are not inconsistent with Virginia law.

Branch then avers that *Rutland v. State Farm Mutual Auto Ins. Co.* should be disregarded because it "was an appeal of a suit specifically over coverage after testimony had been developed and after the underlying trial was resolved." (Dkt. 36 at 13.) Here again, while all that is correct, *Rutland* nevertheless stands for the principle that an insurer cannot be held liable for a claim against its insured that arises after the insurance contract has been cancelled – and that was precisely the situation under review in *Rutland. See Rutland v. State Farm Mutual Auto Ins. Co.*, 426 Fed. Appx. 771, 774 (11th Cir. 2011) (rejecting the appellant's contention that State Farm had a duty to defend and indemnify her in the underlying lawsuit, because of a putative oral binder from her insurance agent reinstating her insurance).

Branch also attempts to distinguish *Union Insurance Company v. Soleil Group, Inc.*, on the ground that there, the court "did not rely on the consideration of extrinsic evidence and merely note[d] the parties argued Maine state case law. . . ." (Dkt. 36 at 13.) Here, too, Branch misses the point: while *Soleil* held that the Maine authorities cited by both parties before it were inapplicable, because the "case [was] not about whether a policy [was] in force," *Soleil*, 465 F. Supp.2d at 574, the court nevertheless clearly signaled by way of its discussion of the rationale underlying the Maine authorities in question, that if the existence of a valid insurance contract *had* been at issue, the court *would* have had reason to follow the authorities cited by the parties and to consider extrinsic evidence. *See id.* n.2. *Soleil*, therefore, is not to be lightly dismissed as mere *dicta*.

II. THE AUTHORITIES ON WHICH PENN NATIONAL RELIES ARE CONSISTENT WITH VIRGINIA LAW GOVERNING INSURANCE CONTRACT INTERPRETATION

Furthermore, the authorities cited by Penn National holding that courts may properly consider extrinsic evidence on the question of an insurance policy's cancellation for nonpayment of premium are not only well-reasoned and persuasive, but they are consonant with a well-established principle of Virginia law on insurance-contract interpretation: while "insurance contracts, like other contracts, generally are to be construed according to their terms and without reference to parol evidence. . . . resort to parol evidence is [nevertheless] proper where a latent ambiguity exists in a particular insurance contract." *Southern Ins. Co. of Va. v. Williams*, 561 S.E.2d 730, 733 (Va. 2002). The existence *vel non* of a valid insurance contract at the time of the property damage at issue is akin to the resolution of a latent ambiguity.

"An ambiguity is latent where the language in question appears 'perfectly clear' at the time of contract formation, but owing to 'subsequently discovered or developed facts, may reasonably be interpreted in either of two ways.'" *Lott v. Scottsdale Ins. Co.*, 827 F. Supp.2d 626, 631 (E.D. Va. 2011), citing *VEPCO v. Norfolk So. Ry. Co.*, 683 S.E.2d 517, 526 (Va. 2009). "[P]arol evidence may be used to resolve latent ambiguities." *Id.*, citing *Williams*, 561 S.E.2d at 733. *See Cox v. Snap, Inc.*, No. 1:16cv9, 2016 U.S. Dist. LEXIS 128605, *16 (E.D. Va. Sept. 20, 2016). The instant situation – where the Insurance Contracts were cancelled effective July 31, 2017, a fact not at issue in the Underlying Action – is somewhat analogous to the circumstance of a latent ambiguity: the Insurance Contracts are perfectly clear on their face (and Branch does not contend otherwise), but there is a genuine question as to whether those contracts were in effect when the alleged property damage occurred. This situation is thus similar to one where, "owing to subsequently . . . developed facts" – *i.e.*, the Insurance Contracts' termination on July 31, 2017, and Branch's admission that the property damage began six months after a certificate of occupancy

was issued for the Project on April 5, 2017[7] – the Insurance Contracts "may reasonably be interpreted in either of two ways," *Lott*, 827 F. Supp.2d at 631, *viz.* as either being in effect when the alleged damage occurred, or not.

Viewed in this light, it is entirely consistent with Virginia's law on contract interpretation for the Court to consider extrinsic evidence relating to whether the Insurance Contracts remained in force at the time of the property damage alleged in the Underlying Action: there is no ambiguity on the contracts' face, but the duration of the contracts' coverage period as it relates to the property damage at issue could be analogized to a latent ambiguity. Thus, the Court has even more reason to consider, and to follow, the authorities on which Penn National relies.

## III. BRANCH PRESENTS NO EVIDENCE CONTRADICTING PENN NATIONAL'S, OR OVERCOMING BRANCH'S OWN ADMISSION

In "determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues [of material fact] filed in opposition to the motion." E.D. Va. L. R. 56(B). A "genuine" issue of material fact is present only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. As discussed in subsections D and E below, Branch presents no evidence contradicting the indisputable facts of record identified by Penn National and, therefore, the Court should assume those facts to be admitted. *See* E.D. Va. L. R. 56(B). Even more problematic for Branch, however, is its conclusive and binding judicial admission that the property damage at issue did not begin until October, 2017, as detailed below.

---

[7]    *See* Dkt. 34, Stmt., ¶ 28; Dkt. 34-1, nos. 1 & 2. A "judicial admission is a formal concession . . . that is binding on the party making [it]. Although a judicial admission is not itself evidence, it has the effect of withdrawing a fact from contention." *Gerhardt v. Air Trans. Local 557*, No. H-09-334, 2011 WL 666500, *10 (S.D. Tex. Feb. 14, 2011) (int'l punct. omit'd)*, cit'g Martinez v. Bally's La., Inc.*, 244 F.3d 474, 476 (5th Cir. 2001). "A judicial admission is usually treated as absolutely binding." *New Amsterdam Cas. Co. v. Waller*, 323 F.2d 20, 24 (4th Cir. 1963). (See further discussion in sections III.A, III.B, and III.C, below.)

A. The First Occurrence of the Alleged Property Damage in October, 2017, is Conclusively Established by Branch's Judicial Admission

As detailed in the Opening Brief, Branch has admitted that the damage alleged in the Underlying Action first manifested itself in October, 2017.  (Dkt. 34, Stmt., ¶ 28.)  Branch tries to avoid that binding admission by asserting, in a footnote, that it did not actually admit to the date of the damage's manifestation but, rather, merely the date that Genesis reported it to Branch.  (Dkt. 36 at 4, n.1.)  That assertion does not withstand scrutiny.

A "party served with a request for admission of a fact that it . . . knows to be true . . . must admit that fact, even if that admission will gut its case and subject it to summary judgment.  That is what Rule 36 was intended to do – narrow the issues for trial, or even altogether obviate the need for trial." *Shelton v. Fast Advance Funding, LLC*, 805 Fed. Appx. 156, 158 (3d Cir. 2020), *quot'g Langer v. Monarch Life Ins. Co.*, 966 F.2d 786, 803 (3d Cir. 1992).  "Rule 36(b) provides that 'any matter admitted under this rule is *conclusively* established unless the court *on motion* permits withdrawal or amendment of the admission.'" *Cereghino v. Boeing Co.*, 873 F. Supp. 398, 401 (D. Ore. 1994) (orig'l emph.), *quot'g* Fed. R. Civ. P. 36(b).

"In form and substance, a Rule 36 admission is comparable to an admission in pleadings or a stipulation drafted by counsel for use at trial. . . . An admission that is not withdrawn or amended cannot be rebutted by contrary testimony or ignored by the district court simply because it finds the evidence presented by the party against whom the admission operates more credible." *Longoria v. Cnty. of Dallas*, No. 3:14cv3111, 2016 U.S. Dist. LEXIS 161675, *13 (N.D. Tex. Nov. 22, 2016), *quot'g Am. Auto. Ass'n, Inc. v. AAA Legal Clinic of Jefferson Crooke, P.C.*, 930 F.2d 1117, 1120 (5th Cir. 1991). *See Kaminski v. First Union Corp.*, No. 99-CV-4783, 2000 U.S. Dist. LEXIS 11269, *5 (E.D. Pa. Aug. 10, 2000) ("Admissions have a conclusively binding effect unless withdrawn or amended by the court").

Over its objection (see subsection C below),[8] Branch admitted that the document appended to Penn National's first requests for admission as Attachment 1 was a true and correct copy of a series of emails between Branch's counsel and defense counsel for River City in the Underlying Action, including an email from Branch's counsel to River City's counsel dated September 18, 2020. (Dkt. 34-1 no. 1; Dkt. 34-2 no.1, attachment 1.) In that email, Branch's counsel answered the following question posed by River City: "[W]hen did the water damage occur/begin? Also, how long after River City . . . completed [its] work at the site did the water damage occur?" (Dkt. 34-2, attachment 1, 9/18/20 1:05 p.m. K. Hardt email to R. Policano, no. 4.) Branch's counsel answered that "*[w]ater infiltration started ~ six months after the certificate of occupancy*. . . . However, the extent and scope of damage was only discovered with disassembly of the siding and fenestrations, which was not completed until November/December of 2019." (Dkt. 34-2, attachment 1, 9/18/20 1:05 p.m. K. Hardt email to R. Policano, no. 4.a) (emph. supp'd). It is undisputed that the certificate of occupancy was issued on April 5, 2017. (Dkt. 34-1, no. 2; Dkt. 34-2, no. 2, attachment 2.)

By no stretch of the imagination can that statement from Branch's counsel to River City's counsel be construed as "merely discuss[ing] when the owner of the [Project] complex provided to Branch a complaint about water intrusion." (Dkt. 36 at 4 n.1.) "Absent egregious circumstances . . . an attorney's written admission is binding" on his client.[9] *Santiago v. Holder*, 657 F.3d 820, 830 (9th Cir. 2011). *See Treadway Cos. v. Brunswick Corp.*, 364 F. Supp. 316, 321 n.1 (3d Cir. 1973); *Dubon v. Barr*, No. 20-71184, 2020 U.S. App. LEXIS 36437, *1-*2 (9th Cir. Nov. 19, 2020). And a "judicial admission is usually treated as *absolutely* binding." *New Amsterdam Cas. Co. v. Waller*, 323 F.2d 20,

---

[8]    It has been widely recognized that answering a discovery request over an objection waives the objection, and the discovery answer or response stands notwithstanding the objection. *See, e.g., Gust v. Wireless Vision, LLC*, No. 15-2646-KHV, 2015 U.S. Dist. LEXIS 171817, *3 (D. Kan. Dec. 24, 2015). (See further discussion in subsection B below.)

[9]    Even if its counsel's statement were not binding on Branch (it is), at the very least the statement is admissible, and not hearsay, as the statement of a party opponent. *See* F.R.E. 801(d)(2) (a statement offered against an opposing party and made by that party's agent on a matter within the scope of that relationship while it existed is not hearsay). Such a statement "must be considered." F.R.E. 801(d).

24 (4th Cir. 1963) (emph. supp'd).  Even though "a judicial admission is not itself evidence, it has the effect of withdrawing a fact from contention." *Gerhardt v. Air Trans. Local 557*, No. H-09-334, 2011 WL 666500, *10 (S.D. Tex. Feb. 14, 2011) (int'l punct. omit'd)*, cit'g Martinez v. Bally's La., Inc.*, 244 F.3d 474, 476 (5th Cir. 2001).  Thus, irrespective of any putative evidence it might now proffer, Branch is bound by its attorney's admission that the water damage at issue only started six months after the certificate of occupancy for the Project was issued – and it is undisputed that the certificate of occupancy was issued on April 5, 2017.  (Dkt. 34-1, no. 2; Dkt. 34-2, no. 2, attachment 2.)  In other words, Branch has admitted that the water damage began in October, 2017, and it cannot now avoid the binding effect of that admission.

Branch has never moved to withdraw its admission to the veracity and authenticity of Attachment 1 to Penn National's first requests for admission.  Neither has Branch offered any explanation for its attorney's admission as to the date of the alleged property damage, to try to suggest that counsel was misinformed in some respect.  Instead, Branch has merely objected that the document should not be considered in evidence because it purportedly was "part of a string of emails relating to . . . preliminary [settlement] negotiations, and cannot be taken out of context of those negotiations and should be considered confidential and privileged and not to be used in this matter."  (Dkt. 34-1, no. 1.)  But ***Branch has not shown any evidence whatsoever to establish such a settlement context***; instead, it merely repeats the conclusory assertion presented in its objection to Penn National's request for admission.  (Dkt. 36 at 4 n.1.)  ***Branch bears the burden to prove that the emails at issue were sent in the course of such negotiations***.  *See Stack v. Abbott Labs., Inc.*, No. 1:12cv148, 2016 U.S. Dist. LEXIS 148676, *10 (M.D.N.C. Oct. 27, 2016); *Macsherry v. Sparrows Pt., LLC*, No. ELH-15-022, 2018 U.S. Dist. LEXIS 33220, *9 (D. Md. Mar. 1, 2018).  As Branch has failed to meet its burden in this respect, there is no barrier to the Court's reliance upon Branch's admission to the October, 2017 onset of the alleged property damage.

### B. Branch Waived its Objection to Penn National's Request for Admission Number 1 by Answering over the Objection

As noted in the Opening Brief, Branch objected to Penn National's request for admission number 1 on the ground that the email communication to which Branch was asked to admit consisted of "information relating to preliminary confidential settlement negotiations between counsel for Branch and defense counsel for River City. . . . [and] [t]he [subject] emails are part of a string of emails relating to these preliminary negotiations. . . ." (Dkt. 34, Stmt., ¶ 9 n.5.)  While that objection is insupportable and erroneous (see subsection C below), there is a more fundamental problem with it – Branch has waived its objection.

Federal courts have widely recognized that "objecting [to] but answering [a discovery request] subject to the objection is not one of the allowed choices under the Federal Rules," and that "whenever an answer accompanies an objection, the objection is deemed waived and the answer, if responsive, stands."  *Gust v. Wireless Vision, LLC*, No. 15-2646-KHV, 2015 U.S. Dist. LEXIS 171817, *3 (D. Kan. Dec. 24, 2015).  *See Meese v. Eaton Mfg. Co.*, 35 F.R.D. 162, 166 (N.D. Ohio 1964).  "Thus, no objections may be 'reserved' under the [Federal] [R]ules; 'they are either raised or they are waived.'"  *Sprint Communs. Co., L.P. v. Comcast Cable Communs., LLC*, No. 11-2684-JWL, 2014 U.S. Dist. LEXIS 16938, *10 (D. Kan. Feb. 11, 2014), quoting *Tardiff v. People for the Ethic'l Treat't of Animals*, No. 2:09cv537, 2011 U.S. Dist. LEXIS 47132, *5 (M.D. Fla. Apr. 29, 2011).

Having made its objection regarding the putative settlement-negotiation context of the emails to which it was asked to admit, Branch nevertheless answered:  "Without waiving this objection and subject thereto, the Attachment 1 [to the request for admission] is a true copy of a partial string of emails between counsel [for Branch and for River City] as preliminary confidential settlement negotiations."  (Dkt. 34-1, no. 1.)  By giving that answer, Branch waived its objection, and its admission stands.

C. The Statement to which Branch has Admitted is not a "Statement made during Compromise Negotiations" within the Meaning of Rule 408 of the Federal Rules of Evidence

Furthermore, even if Branch had made some effort toward meeting its burden to prove that the emails in question were made in the course of settlement negotiations – and, clearly, it has made no such effort – and even if Branch had not waived its objection to the emails' admissibility (it has), on their face the emails do not qualify as statements made during compromise negotiations, which are to be excluded under Rule 408 of the Federal Rules of Evidence.[10]  For this further reason, Branch's argument fails.

Rule 408 provides, in part, that "[e]vidence of the following is not admissible . . . either to prove or disprove the validity . . . of a disputed claim or to impeach a . . . contradiction. . . . [A] statement made during compromise negotiations about the claim. . . ." F.R.E. 408(a)(2).  "[B]efore there can be settlement negotiations, both sides must acknowledge, in some manner, that this is what is transpiring. In other words, one party cannot conduct an ex parte negotiation with the other party." *Lee Middleton Orig'l Dolls, Inc. v. Seymour Mann, Inc.*, 299 F. Supp.2d 892, 895 (E.D. Wis. 2004).  "A determination of whether a statement falls within the protection of Rule 408 is a matter for the [C]ourt, in accordance with Rule 104(a)." *Macsherry*, 2018 U.S. Dist. LEXIS 33220, *8-*9.  *See* F.R.E. 104(a).

"When facing an issue of whether to admit or exclude evidence under Rule 408, a court must decide whether the statements or conduct were intended to be part of the negotiations for compromise." *Elliott v. Great Pt. Partners, LLC*, No. 1:10cv1019, 2011 U.S. Dist. LEXIS 1315, *18 (E.D. Va. Jan. 5, 2011) (int'l punct. & cit. omit'd).  Documents purportedly subject to exclusion under Rule 408 must contain on their face statements "reasonably . . . viewed as 'statements made in compromise negotiations regarding a claim' that was in dispute." *Rodriguez-Garcia v. Mun. of Caguas*, 495 F.3d 1, 11 (1st Cir.

---

[10]    Branch fails to consider one point that Penn National raised in the Opening Brief regarding Branch's admission:  even if Branch could meet its burden to show that the emails in question should be excluded under Federal Rule of Evidence 408, Rule 56(c)(2) only prevents the Court from considering this evidence if it "cannot be submitted in a form that would be admissible in evidence" – such as direct- or cross-examination of Branch's witnesses and/or other witnesses at trial.  *See* Fed. R. Civ. P. 56(c)(2).  (Dkt. 34, Stmt., ¶ 9 n.5.)  Clearly, the evidence *can* be so presented, and Branch's argument for inadmissibility is largely an exercise in futility.

2007), quoting F.R.E. 408(a)(2). In short, the statement must be "the kind of statement that one would be reluctant to make to a potential adversary in an effort to reach an agreement about a dispute without the protection of Rule 408." *Id.* at 12.

For this reason, communications which evince nothing more than one party's request for information and the other party's provision of that information generally do not qualify as statements made during compromise negotiations about the claim. *See Latorraca v. Centennial Techs., Inc.*, 583 F. Supp.2d 208, 213 (D. Mass. 2008) (holding that one attorney's letter to an opposing attorney that "respond[ed] to [a] plain request for information without reference to a settlement" was not excluded under Rule 408). That is because "letters whose contents offer[ ] no concessions [do] not meet the definition of 'compromise' and thus [fall] outside the scope of" Rule 408. *Rodriguez-Garcia*, 495 F.3d at 12, citing *Sandlin v. Shapiro & Fishman*, 919 F. Supp. 1564, 1569 (M.D. Fla. 1996).

The emails to which Branch objected in answering Penn National's first requests for admission, like the letters at issue in *Rodriguez-Garcia*, do not offer any concessions nor do they contain "the kind of statement[s] that one would be reluctant to make to a potential adversary in an effort to reach an agreement about a dispute without the protection of Rule 408." *Id.* On the contrary, these emails are very much akin to the letter from one attorney to another at issue in *Latorraca*, responding to a "plain request for information without reference to a settlement." *Latorraca*, 583 F. Supp.2d at 213. In fact, Branch conceded as much when it responded to Penn National's requests for admissions, by asserting that in the emails to which Branch was asked to admit Branch "was merely responding to a question raised by counsel for River City as part of . . . preliminary negotiations. . . ." (Dkt. 34-1, no. 1; *cf.* Dkt. 34-2, no. 1 & Attachment 1.) The emails to which Branch has admitted simply do not constitute statements made during compromise negotiations, and they thus fall beyond the scope of Rule 408.

### D. Branch Cannot Rely on a Self-Serving Affidavit to Overcome its Admission that the Alleged Property Damage began in October, 2017

In an effort to create a fact dispute as to when the alleged property damage began – notwithstanding Branch's binding admission that the property damage began in October, 2017 – Branch presents an affidavit from Berton Austin, its vice president of business operations, swearing to the authenticity of certain documents appended to his affidavit. (Dkt. 37.) Those documents purportedly "show that as early as September 2016 and January 2017, water leaks and damages were occurring at the [P]roject as a result of River City's work." (Dkt. 36 at 4 n.1.) There are two insurmountable problems with this putative evidence, however, and the first is the fact that it contradicts Branch's prior judicial admission regarding the beginning of the property damage.

"Under what is known as the 'sham affidavit rule,' a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting [its] own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *King v. Eastern Shore Water, LLC*, No. SKG-11-1482, 2012 U.S. Dist. LEXIS 107300, *18 (D. Md. July 31, 2012), cit'g *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984). "Depending on the degree of inconsistency, a court has the discretion to disregard the conflicting affidavit in its entirety" in favor of the previous admission. *Graham v. RRR, LLC*, 202 F. Supp.2d 483, 487 (E.D. Va. 2002), cit'g *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 973 (4th Cir. 1994).

This is exactly the situation presented here: after having admitted that the alleged property damage only began in October, 2017, Branch has submitted an affidavit from its vice president, Mr. Austin, swearing to the authenticity of documents that purport to state the property damage actually began in late 2016. ***Branch makes no attempt to explain the discrepancy between its admission that the damage began in October, 2017, and Mr. Austin's affidavit regarding documentation of damage occurring earlier***. *See King*, 2012 U.S. Dist. LEXIS 107300, *18. Because the affidavit evidence

flatly contradicts Branch's previous admission, the Court should disregard the affidavit in favor of the earlier admission. *See Graham*, 202 F. Supp.2d at 487.

E. The Documents appended to Mr. Austin's Affidavit Predate the Project's Certificate of Occupancy

Finally, even if (a) Branch were not conclusively bound by its admission to the October, 2017, onset of the property damage at issue, (b) Branch's admission came in the context of a statement made in the course of settlement discussions, and (c) Branch's self-serving affidavit contradicting its earlier admission could be credited, the second problem with the documents proffered by Branch is that they do not establish property damage insured by Penn National, as they only report water damage that occurred ***before*** the Richmond Building Inspector certified the Project for occupancy. For this still further reason, Branch fails to establish a dispute of material fact.

It is undisputed that on April 5, 2017, the Richmond Building Inspector issued a certificate of occupancy of the Project. (Dkt. 34-1, no. 2; Dkt. 34-2 no. 2, Attachment 2.) That certificate was issued with respect to the Project's entire construction: "Building: Construct Apartment Building per Attached Architect's Plans." (Dkt. 34-2, Attachment 2.) A certificate of occupancy "indicates completion of the work for which a permit was issued. . . . [and it is] issued after completion of the final inspection and when the building or structure is in compliance with [the building code] and any pertinent laws or ordinances." *Nat'l Fair Hous'g Alliance v. Hunt Invs., LLC*, No. 3:14cv716, 2015 U.S. Dist. LEXIS 91682, *6 n.9 (E.D. Va. July 14, 2015).[11] Generally, a building contractor ceases to have contractual responsibility for correcting its own faulty work once there has been a final inspection of the work, upon its completion. *See Holmes v. Culver Design Build, Inc.*, No. 2091-13-4, 2015 Va. App. LEXIS 26, *2-*3 (Va. Ct. App. Jan. 27, 2015). Under the Virginia Uniform Statewide

---

[11] Notably, *National Fair Housing Alliance* appears to relate to the same Project at issue in this action, though that lawsuit did not involve the same parties. According to the Court's opinion, *National Fair Housing Alliance* was "a civil rights action brought . . . against the developers, builders, designers, and owners of the multifamily apartment complex 'Shockoe Valley View Apartments' . . . located in Richmond, Virginia. . . ." *Nat'l Fair Hous'g Alliance v. Hunt Invs., LLC*, No. 3:14cv716, 2015 U.S. Dist. LEXIS 91682, *2 (E.D. Va. July 14, 2015).

Building Code (the "Code"), a certificate of occupancy must be obtained "[p]rior to occupancy or change of occupancy of a building or structure. . . . The building official shall issue the certificate of occupancy within five working days after approval of the final inspection and when the building or structure or portion thereof is determined to be in compliance with this code and any pertinent laws or ordinances, or when otherwise entitled."  Code, § 116.

The Code, as adopted in the City of Richmond, provides that "[e]xterior walls shall provide the building with a weather-resistant exterior wall envelope.  The exterior wall envelope shall include flashing, as described in Section 1404.4.  The exterior wall envelope shall be designed and constructed in such a manner as to prevent the accumulation of water within the wall assembly by providing a water-resistive barrier behind the exterior veneer, as described in Section 1403.2, and a means for draining water that enters the assembly to the exterior."  Code, § 1402.2.  Section 1404.4 requires that "[f]lashing shall be installed in such a manner so as to prevent moisture from entering the wall or to redirect that moisture to the exterior."  Code, § 1404.4.  The Code further provides that "[r]oof decks shall be covered with approved roof coverings secured to the building or structure in accordance with the provisions of this chapter," and "[r]oof coverings shall be designed in accordance with this [C]ode, and installed in accordance with this [C]ode and the manufacturer's approved instructions."  Code, § 1503.1.  "Flashing shall be installed in such a manner so as to prevent water from entering the wall and roof through joints in copings, through moisture-permeable materials and at intersections with parapet walls and other penetrations through the roof plane."  Code, § 1503.2.

Based on the Project's April 5, 2017 certification for occupancy, any putative roofing or siding problems at the Project and any resulting water penetration or water damage had to have been corrected and repaired before that date; otherwise, the certificate would not have been issued, as such water penetration would have violated the Code.  *See Nat'l Fair Hous'g All.*, 2015 U.S. Dist. LEXIS 91682, *6 n.9.  The certificate of occupancy, therefore, serves as a benchmark, establishing that as of April 5, 2017, any previous water-infiltration issues at the Project had been repaired in the course of River

City's and/or Branch's ongoing work, and that the work was completed as of the certificate's date.  *See id.*  Thereafter, the contractors ceased to have contractual responsibility for the work.  *See Holmes*, 2015 Va. App. LEXIS 26, *2-*3.

As a general contractor, Branch is chargeable with knowledge of the laws, codes, and standards governing building construction.  *See Fodge v. Bd. of Educ.*, 32 N.E.2d 650, 657 (Ill. App. Ct. 1941). Thus, Branch's admission that the property damage at issue began in October, 2017, can be taken at face value:  that date represents the initial onset of water infiltration or water damage *following the Project's completion*.  Any similar infiltration or damage that may have occurred prior to the Project's completion had to have been repaired or corrected before the certificate of occupancy was issued; thus, the damage at issue in the Underlying Action did not occur before October, 2017 – some three months after the Insurance Contracts were cancelled.  Even if the Project's roof and siding leaked like a proverbial sieve prior to April, 2017, the Richmond Building Inspector certified that the Project complied with the Code's requirements by April 5, 2017, including those for the roof, flashing, and exterior walls.  Any damage that may have occurred prior to that date, therefore, had to have been repaired, and the causative faults corrected, before the inspector's certification; thus, only water infiltration or damage that occurred after April 5, 2017, can form the basis for Branch's claims in the Underlying Action – and there is no evidence of any such water infiltration or water damage until October, 2017.  As Branch does not dispute the applicability of the "manifestation" rule here (*see* Dkt. 36 at 14; *cf.* Dkt. 34 at 13-21), the Court should hold that the alleged property damage did not occur until that damage first manifested itself in October, 2017.

### REBUTTAL ARGUMENT – LACK OF "OCCURRENCE," AND EXCLUSIONS

I.  THE INSURANCE CONTRACTS DO NOT REQUIRE PENN NATIONAL TO PAY FOR THE REPLACEMENT OR REPAIR OF RIVER CITY'S FAULTY WORK

Even if the undisputed (and uncontested) facts on record demonstrated that "property damage" occurred during the Insurance Contracts' coverage period – and they do not – Branch fails to show that

Branch's alleged repair and replacement of River City's purportedly faulty work is insured.  Branch thus fails to show why partial summary judgment, at the very least, should not be entered in Penn National's favor.

Branch cites the general principle that "where the work of one subcontractor damages the work of other subcontractors or damages parts of the building other than the work of the subcontractor[,] that can be an 'occurrence covered by the at-fault subcontractors' [*sic*] CGL policy." (Dkt. 36 at 11.)  That statement, insofar as it goes, is correct.  ***But that is not the point*** – Penn National has demonstrated why at least a substantial portion of the remedial work Branch alleges to have performed at the Project cannot be construed as "property damage" caused by an "occurrence," as much of that remediation consisted of Branch's repair or replacement of the Project's roof and siding, ***all of which*** River City allegedly installed.  (Dkt. 34 at 21-24.)  As the repair of the roof and siding does not constitute physical injury to tangible property ***other than*** River City's own work, it does not constitute "property damage" caused by an "occurrence," and it therefore falls outside the outermost scope of insurance provided under the Insurance Contracts.  Branch presents no facts, legal authorities, or argument to contest that reality and, thus, the Court should hold that Penn National is relieved, at a minimum, from paying for the cost of that portion of remediation and repair at the Project.

## II.  BRANCH FAILS TO OVERCOME THE INSURANCE CONTRACTS' "YOUR WORK" EXCLUSIONS

Branch dismissively waives off Penn National's contention that the Insurance Contracts' respective "your work" exclusions bar coverage for the Claim, glibly asserting that "these are indemnity arguments not duty to defend arguments."  (Dkt. 36 at 14; *cf.* Dkt. 34 at 26-28.)  Branch makes no mention of Penn National's exclusive reliance on Branch's allegations in the Underlying Action as the basis for Penn National's argument, however, and it is black-letter law in Virginia that if "it appears clearly that the insurer would not be liable under its contract for any judgment ***based upon the allegations***, it has no duty even to defend." *AES Corp. v. Steadfast Ins. Co.*, 725 S.E.2d 532, 535-36

(Va. 2012) (emph. supp'd).  *See Liberty U., Inc. v. Citizens Ins. Co. of Am.*, 792 F.3d 520, 529 (4th Cir. 2015) ("if it appears clearly that the insurer would not be liable under its contract for any judgment based upon the allegations," the insurer is relieved of the duty to defend).  In short, Branch misses the point.

And having missed the point, Branch has nothing of substance to say in response to the "your work" exclusions, other than that "[t]here has been no determination in the [Underlying Action] for what damages River City is liable," and that "[o]nly after that determination is made can the Court decide what is covered by the [Insurance Contracts] or what may be covered."  (Dkt. 36 at 14.)  That is irrelevant – Branch's own allegations in the Underlying Action clearly establish the applicability of the "your work" exclusions, for the reasons set forth in the Opening Brief.  As Branch offers no substantive response to Penn National's argument in this regard, Branch effectively concedes it.  *See Eady v. Veolia Transp. Servs., Inc.*, 609 F. Supp.2d 540, 560-61 (D.S.C. 2009) (a party's failure to address an argument raised on summary judgment waives opposition to that argument); *Orbit Corp. v. FedEx Ground Pack. Sys.*, No. 2:14cv607, 2016 U.S. Dist. LEXIS 155212, *62 (E.D. Va. Nov. 6, 2016) (same); *Liberty Corp. Cap. v. Palmetto Bluff Shooting Club*, No. 9:19cv521, 2021 U.S. Dist. LEXIS 163768, *12 n.3 (D.S.C. Aug. 24, 2021) (same).

Thus, even alleged property damage at the Project other than the repair and replacement of River City's purportedly faulty work is excluded from insurance coverage under those exclusions, and summary judgment should be entered in Penn National's favor on that further ground.

III. <u>BRANCH ALSO FAILS TO REBUT THE "CONTRACTUAL LIABILITY" EXCLUSIONS</u>

Branch gives the same short shrift to the Insurance Contracts' respective "contractual liability" exclusions that it does to the "your work exclusions," asserting that Penn National's argument is "based solely on the indemnity provision of the subcontracts with River City."  (Dkt. 36 at 15; *cf.* Dkt. 34 at 28-30.)  Notwithstanding its further assertion that "Branch's underlying [c]omplaint clearly states other claims, including claims of malfeasance, not nonfeasance against River City that could potentially be

covered by" the Insurance Contracts, however, *all* of Branch's claims in the Underlying Action seek compensation to recover for the cost of Branch's "repair [of] the damages to the [Project] and the property damages sustained by Genesis" which Branch undertook "[p]ursuant to its contractual and legal obligations with Genesis. . . ."  (Dkt. 34, Stmt., ¶ 15.)  Branch's claims likewise seek to recover compensation for "other damages associated with the property damage at the of [*sic*] of the" Project which Branch "[p]ursuant to its contractual and/or legal obligations with Genesis . . . paid (or will pay) Genesis. . . ."  (Dkt. 34, Stmt., ¶ 16.)  Branch's legal theories for its claims against River City are therefore irrelevant – the damages for which Branch seeks compensation from River City are not for Branch's "tort liability" to Genesis as defined in the Insurance Contracts, but, rather, they are for Branch's contractual liability to Genesis that is plainly excluded from coverage.

Branch does not, and cannot, deny that its putative liability to Genesis is contractual in nature, not tortious, and that it is for such contractual liability Branch seeks indemnity compensation from River City.  Such contractual liability is clearly excluded from insurance coverage, and summary judgment should be entered in Penn National's favor on that separate and additional ground.

IV. <u>BRANCH FAILS TO AVOID THE "IMPAIRED PROPERTY" EXCLUSIONS, AS WELL</u>

Finally, Branch similarly fails to rebut the applicability of the Insurance Contracts' "impaired property" exclusions, as Branch blithely dismisses Penn National's contention as an "indemnity argument" (Dkt. 36 at 14), and offers no substantive response to these exclusions' applicability.  Just as with the "your work" and "contractual liability" exclusions, Branch fails to offer any substantive response to Penn National's argument and, thus, concedes the argument.  *See Eady*, 609 F. Supp.2d at 560-61; *Orbit Corp.*, 2016 U.S. Dist. LEXIS 155212, *62; *Liberty Corp.*, 2021 U.S. Dist. LEXIS 163768, *12 n.3.  Even leaving aside all of the foregoing grounds for non-coverage, therefore, the "impaired property" exclusions relieve Penn National from any duties of defense and indemnification that it otherwise might have.  For this still further reason, the Court should grant the Motion and enter summary judgment in Penn National's favor.

Respectfully submitted,

**PENNSYLVANIA NATIONAL MUTUAL
CASUALTY INSURANCE COMPANY**

By:  SETLIFF LAW, P.C.


_____/s/ Kevin T. Streit_____
Of Counsel

Kevin T. Streit (VSB No. 45024)
Allison F. Rienecker (VSB No. 87951)
SETLIFF LAW, P.C.
4940 Dominion Boulevard
Glen Allen, Virginia 23060
(804) 377-1260
(804) 377-1280 (facsimile)
kstreit@setlifflaw.com
arienecker@setlifflaw.com
*Counsel for Pennsylvania National
    Mutual Casualty Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of December, 2021, a true copy of the foregoing was

transmitted to the following via the Court's ECF system:

> Kenneth F. Hardt, Esq.
> Sinnott, Nuckols & Logan, P.C.
> 13811 Village Mill Road
> Midlothian, Virginia 23114
> khardt@snllaw.com
> *Counsel for Branch Builds, Inc.*

> <u>          /s/ Kevin T. Streit          </u>
> Kevin T. Streit (VSB No. 45024)
> SETLIFF LAW, P.C.
> 4940 Dominion Boulevard
> Glen Allen, Virginia 23060
> (804) 377-1260
> (804) 377-1280 (facsimile)
> kstreit@setlifflaw.com
> *Counsel for Pennsylvania National Mutual*
> *   Casualty Insurance Company*