**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | )    C. A. No. 3:21cv365-HEH |
| | ) |
| RIVER CITY ROOFING, LLC, *et al.*, | ) ) |
| Defendants. | ) ) ) |

**PLAINTIFF'S REPLY TO BRANCH BUILDS, INC.'S OPPOSITION TO
PENN NATIONAL'S MOTION FOR RECONSIDERATION (DKT. 52, DKT. 53)**

The Plaintiff, Pennsylvania National Mutual Casualty Insurance Company ("Penn National"),

by counsel, states the following in reply to Defendant Branch Builds, Inc.'s ("Branch") opposition

(Dkt. 56)[1] to Penn National's Rule 54(b) motion for reconsideration (Dkt. 52) (the "Motion") of

the Court's March 3, 2022 Memorandum Opinion (Dkt. 48) and Order (Dkt. 49).[2]  For the reasons

set forth herein, Penn National respectfully renews its request that the Court grant the Motion and

amend the Court's Order (Dkt. 49) to enter final, summary judgment in Penn National's favor.

<u>BRANCH MISCONSTRUES RULE 54(b)'S STANDARD FOR THE MOTION</u>

Although Branch states that it "does not dispute the general statement for the re-evaluation

[*sic*] of an interlocutory order as set forth in" Penn National's opening brief, Branch nevertheless

avers that "the general standard is much broader than suggested. . . ."  (Dkt. 55 at 3.)  Branch

---

[1]     Branch's opposition to Penn National's motion for reconsideration consists entirely of an incorporation, by reference, of Branch's brief in support of its own motion for reconsideration.  (Dkt. 56; *cf.* Dkt. 54, Dkt. 55.) Penn National reserves the right to separately respond in opposition to Branch's motion as provided under Rule 7 of this Court's Local Rules.  *See* E.D. Va. L.R. 7(F)(1).  Because the substance of Branch's opposition argument is stated in Branch's brief in support of its own motion for reconsideration, Penn National references the latter herein, as the "Opposition" or as "Dkt. 55 at __."

[2]     Penn National's summary judgment motion (Dkt. 33), supporting briefs (Dkt. 34, Dkt. 45), and opening brief supporting the Motion (Dkt. 53) are incorporated herein, by reference.  Penn National's opening brief (Dkt. 53) is referenced herein as the "Opening Brief," and is cited herein as "Dkt. 53 at __."

quotes at length from an unreported decision from this Court, *McAfee v. Boczar*, to suggest the controlling Fourth Circuit standard for deciding Rule 54(b) motions for reconsideration somehow varies from the Opening Brief's recitation (though that is not what *McAfee* states).  (Id.)  The Fourth Circuit's standard is well-established, however:   courts "may grant a motion for reconsideration under Rule 54(b):  (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available earlier; or (3) to correct a clear error of law or prevent manifest injustice."  *Midgett v. Hardcastle*, No. 2:17cv663, 2018 U.S. Dist. LEXIS 17596, *7 (E.D. Va. Oct. 3, 2018); *see Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003).  As stated in the Opening Brief, the Motion rests upon the third prong of that standard.  The Opposition fails to address that standard, just as it fails to rebut or distinguish the controlling Virginia law on which the Motion is grounded.

<u>ARGUMENT</u>

I.   BRANCH DOES NOT ATTEMPT TO DISPUTE OR DISTINGUISH THE CONTROLLING AUTHORITIES CITED IN THE OPENING BRIEF

As discussed in the Opening Brief, just one aspect of the Court's March 3, 2022 Order and Opinion meet the Fourth Circuit's clear-error standard under Rule 54(b):  in holding that "a ruling on th[e] duty [to indemnify] should be deferred until a final ruling in the underlying state case," (Dkt. 48 at 12),[3] the Court simply overlooked the battery of Virginia authorities holding that "[b]ecause the duty to defend is broader than the duty to indemnify, ***if there is no duty to defend there can be no duty to indemnify***."  *Builders Mut. Ins. Co. v. Futura Group, LLC*, 779 F. Supp.2d 529, 534 (E.D. Va. 2011) (emph. supp'd), *cit'g Penn-America Ins. Co. v. Coffey*, 368 F.3d 409, 413 (4th Cir. 2004) (applying Va. law).  *See also, inter alia, Selective Way Ins. Co. v. Crawl Space*

---

[3]   The Court's March 3, 2022 opinion transmitted to the parties via the ECF system was scanned with several of the pages out of order.  Penn National therefore references the opinion herein according to the opinion's page numbers provided at the bottom of each page, rather than according to the numbering assigned them by the ECF scan.

*Door Sys.*, 162 F. Supp.3d 547, 552 (E.D. Va. 2016) (same).  That principle is as close to being carved-in-stone as a rule of law gets:  if an underlying complaint does not allege facts implicating an insurer's duty to defend, then the insurer cannot possibly have a duty to indemnify, either.  (See Dkt. 34 at 10-11.)

The only portion of the Opposition that even hints at questioning this irrefutable principle is a footnote on page 2, where Branch erroneously asserts that the Court's decision to hold in abeyance judgment on the duty to indemnify until the conclusion of the underlying lawsuit "makes sense, as [River City Roofing, LLC ('River City')] could prevail in the underlying suit, thus mooting any coverage analysis."  (Dkt. 55 at 2, n.1.)  In support of that misstatement of controlling law, Branch cites the Western District's decision in *Nautilus Ins. Co. v. Strongwell Corp.*, 968 F. Supp.2d 807, 824 (W.D. Va. 2014).  As with the decisions on which Branch relied in opposing Penn National's summary judgment motion (some of which the Court referenced in its March 3 opinion), *Strongwell* is distinguishable for one simple reason:  *the insurer there had a duty to defend its insured*.

Unlike the present case, *Strongwell* involved the insurer's motion for reconsideration of the district court's holding that the insurer, Nautilus, **had a duty to defend** the insured, Strongwell (as well as a duty to indemnify), ***based upon the allegations in the underlying lawsuit***.  968 F. Supp.2d at 822.  It was for *that* reason the district court held – correctly – that it could not yet render a decision on the duty to indemnify, as the facts which would govern that determination had to be decided in the underlying lawsuit.  *Id.* at 824-825.  The Western District concluded that waiting for the underlying case to be tried before deciding the duty of indemnification was necessary, because the duty to indemnify "is based on 'litigated facts' . . . [and] generally arises only after an insured has become liable, whether by judgment or settlement, for damages that are

covered by the policy." *Id.* at 823, *quot'g CACI Int'l, Inc. v. St. Paul Fire & Mar. Ins. Co.*, 566 F.3d 150, 155 (4th Cir. 2009).

***There is no such impediment here***.  The Court has already held, as a matter of law, that based upon Branch's allegations against River City in the underlying lawsuit Penn National has no duty to defend River City:  "because no judgment [in the underlying lawsuit], based on the allegations against River City, would be covered under [Penn National's] policies, there is no genuine dispute as to any material fact regarding the duty to defend.  Therefore, th[e] Court conclude[d] that [Penn National] does not have a duty to defend River City in the underlying state action."  (Dkt. 48 at 12.)  ***That holding readily distinguishes this case from* Strongwell *and from the decisions cited by the Court for declining to render a decision on the duty of indemnification.***  (Dkt. 48 at 6-7; *cf.* Dkt. 53 at 6-8.)

The Opposition never mentions the concrete, determinative distinction between this case and the decisions on which it relies, including *Nautilus*, much less refute that distinction.  Nor could Branch possibly interpret *Nautilus* and similar decisions to mean that when an insurer has no duty to defend its insured, the insurer nevertheless might still have a duty to indemnify the insured for an adverse judgment.  By no stretch of the imagination could a judgment against River City in the underlying lawsuit "moot[ ] any coverage analysis" (Dkt. 55 at 2, n.1) when this Court has already held that Penn National has no duty to defend River City.

II.   BRANCH DOES NOT DISPUTE THE MANIFEST INJUSTICE TO PENN NATIONAL IF THE COURT DOES NOT AMEND ITS MARCH 3, 2022 ORDER AND OPINION

Branch also does not address, or in any way attempt to refute, Penn National's demonstration of why a denial of the Motion would work manifest injustice here, and result in inefficiency in the administration of justice.  (Dkt. 53 at 8-10; *cf.* Dkt. 55, *passim.*)  That injustice and disservice to judicial economy are clear:  so long as there is even the remote (and however erroneous) prospect

of Penn National being held liable by this Court to indemnify River City and/or Branch for such an adverse judgment, Penn National has no reasonable or realistic option but to continue defending River City in the underlying action. Doing so will force Penn National to incur the considerable cost of continuing to defend River City when, clearly, it has no legal obligation to provide such a defense.

Furthermore, because the Court has not entered final judgment for Penn National this case remains active on the Court's docket, and it cannot be brought to an end until the underlying action is concluded (or the Court opts to grant the instant Motion). The inefficiency for the Court, and the parties, is clear. And as Penn National will be forced, as a practical matter, to continue to defend River City despite this Court's correct ruling that no such duty exists, there will be confusion and uncertainty among the parties in that action (and their respective insurers) as to whether Penn National could be expected to contribute toward any potential settlement of the claims in that lawsuit. Such confusion and uncertainty can only complicate any efforts toward there being a compromise settlement in the underlying action.

***The Opposition is silent on these aspects of the Rule 54(b) analysis***, and for good reason – Branch has no answer to them. As Branch fails to address not only the limited portion of the Court's March 3 order and opinion that qualifies as "clear error," but also the manifest injustice that would result if that part of the Court's ruling stands, Branch effectively concedes the argument.

## III. BRANCH FAILS TO SHOW CLEAR ERROR IN THE COURT'S HOLDING THAT PENN NATIONAL HAS NO DUTY TO DEFEND RIVER CITY

Instead of attempting to rebut (or even address) the Opening Brief's arguments, Branch opts instead to attack the bulk of the Court's March 3, 2022 order and opinion, in which the Court *correctly* held that Penn National has no duty to defend River City. In so doing, Branch fails to

show grounds for asking the Court to set aside the law of the case – grounds governed by the same clear-error standard applicable to motions under Rule 54(b).

As noted in the Opening Brief, the law of the case "doctrine 'restricts a court to legal decisions it has made on the same issues in the same case.'" *DietGoal Innovs., LLC v. Wegmans Food Mkts., Inc.*, 993 F. Supp.2d 594, 600 (E.D. Va. 2013), *quot'g MacDonald v. Moose*, 710 F.3d 154, 161 n.10 (4th Cir. 2013). (Dkt. 53 at 7-8, n.6.) This doctrine "***must be followed*** in subsequent proceedings in the same case unless, among other exceptions, 'the prior decision was ***clearly erroneous and would work manifest injustice***.'" *Id.* (emphs. supp'd), *quot'g Sejman v. Warner-Lambert Co., Inc.*, 845 F.2d 66, 69 (4th Cir. 1988). Under this standard, and for the reasons detailed above and in the Opening Brief, the *only* aspect of the Court's March 3 order and opinion which qualifies as "clearly erroneous" is the decision to withhold judgment on whether Penn National has a duty to indemnify River City for an adverse judgment in the underlying lawsuit.

The Fourth Circuit has been blunt in its assessment of the showing necessary to meet the clear-error standard: the decision under review "does not qualify [as clearly erroneous] by being just maybe or probably wrong; it must strike [the reviewing court] as wrong with the force of a five-week-old, unrefrigerated dead fish. It must be dead wrong." *U.S. Tobacco Coop., Inc. v. Big South Wholesale of Va., LLC*, 899 F.3d 236, 258 (4th Cir. 2018). Branch has not come close to showing such error in the Court's decision on the duty to defend.

In fact, it may well be for this reason that Branch attempts to muddy the water in terms of the standard of review. Rather than attempting the show that the Court clearly erred in holding that Penn National has no duty to defend River City – which Branch cannot do – Branch instead attempts to argue that the Court merely "misapprehended applicable controlling law." (Dkt. 55 at 6.) In other words, Branch avers that the Court *maybe* or *probably* erred in its decision – not that

there was error of the force and clarity necessary to overcome the law-of-the-case doctrine. In this way, Branch tacitly acknowledges that it cannot possibly show clear error with respect to the Court's decision on the duty to defend; it cannot.[4]  And as detailed below, not only was the Court's holding on the duty to defend far from "clearly erroneous" but, to the contrary, the Court's decision was absolutely right. Here, too, Branch's argument fails.

## IV. THE COURT CORRECTLY HELD THAT BRANCH'S ALLEGATIONS AGAINST RIVER CITY DO NOT IMPLICATE INSURANCE COVERAGE

The Court succinctly, and correctly, stated Virginia law on an insurer's duty to defend an insured: "There is a well-established principle in Virginia, the Eight Corners Rule, that courts must only consider the allegations in the complaint and the insurance policy itself when deciding if there is a duty to defend. . . . [I]f it clearly appears that the insurance policy would not cover any of the allegations in the complaint, the insurer has no duty to defend." (Dkt. 48 at 6) (citing *AES Corp. v. Steadfast Ins. Co.*, 725 S.E.2d 532, 535 (Va. 2012) (add'l cit. omit'd)). (*Compare* Dkt. 34 at 10-11.)  As the Court explained, Branch's complaint in the underlying lawsuit sets forth allegations which, even if assumed true, would not implicate insurance coverage under Penn National's insurance contract.

### A. The Court Correctly Applied Virginia's Eight-Corners Rule

In holding that Penn National has no duty to defend River City in the underlying lawsuit, the Court properly applied Virginia's black-letter principles of insurance law. The Court rightly noted that generally, "only the allegations in the complaint [against the insured] and the provisions of

---

[4]    Rule 54(b)'s  clear-error requirement– applicable both to motions for reconsideration and to other efforts to set aside the law of the case – is the very reason why Penn National's Motion does not ask the Court to revisit its decision regarding cancellation of Penn National's insurance contracts prior to the occurrence of the property damage at issue:  while Penn National disagrees with the Court's decision in that respect, the absence of *controlling* Virginia law on whether a court may consider extrinsic evidence of such cancellation prevents Penn National from establishing *clear* error sufficient to satisfy the Rule 54(b) standard.  That is not the case with respect to the Court's decision to withhold judgment on Penn National's duty to indemnify – controlling Virginia law on that point is abundant, and clear, and the Court's error in that regard is readily demonstrable.

the insurance policy are to be considered in deciding whether there is a duty on the part of the insurer to defend and indemnify the insured." *AES*, 725 S.E.2d at 535. (Dkt. 48 at 6.) This principle has become known as the "'eight-corners rule' because the determination is made by comparing the 'four corners' of the underlying complaint with the 'four corners' of the policy, to determine whether the allegations in the underlying complaint come within the [insurance] coverage provided by the policy." 725 S.E.2d at 535. (Dkt. 48 at 6.)

Under the eight-corners rule, the "insurer's duty to defend is *broader* than the obligation to pay, and arises whenever the complaint alleges facts and circumstances, some of which would, if proved, fall within the risk covered by the policy." 725 S.E.2d at 535 (emph. supp'd) (int'l punct. & cits. omit'd). (Dkt. 48 at 6.) But if "*it appears clearly that the insurer would not be liable under its contract for any judgment based upon the allegations, it has no duty even to defend*."[5] *Id.* at 535-36 (emph. supp'd). *See Liberty U., Inc. v. Citizens Ins. Co. of Am.*, 792 F.3d 520, 529 (4th Cir. 2015) ("if it appears clearly that the insurer would not be liable under its contract for any judgment based upon the allegations," the insurer is relieved of the duty to defend). (Dkt. 48 at 6.)

As required by these rules of law, the Court looked first to Branch's allegations against River City in the underlying action: "In the State Complaint, Branch alleges that River City breached its contract with Branch." (Dkt. 48 at 8; *cf.* Dkt. 34, Stmt., ¶¶ 12-20.) "Specifically, Branch argues that River City warranted that its work was free from deficiencies in workmanship and materials and that [River City] would indemnify and hold Branch harmless from claims related to River City's work." (Dkt. 48 at 8; *cf.* Dkt. 34, Stmt., ¶¶ 12-20.) The Court then – again, correctly –

---

[5]     And as Penn National has pointed out in the Motion, "[b]ecause the duty to defend is broader than the duty to indemnify, *if there is no duty to defend there can be no duty to indemnify*." *Futura Group*, 779 F. Supp.2d at 534 (emph. supp'd); *see Coffey*, 368 F.3d at 413. (Dkt. 53 at 5-6.)

turned to the terms, conditions, limitations, and exclusions provided under Penn National's insurance contracts, and began by observing that each "policy applies to 'property damage' only if it was caused by an 'occurrence' that takes place in the 'coverage territory'." (Dkt. 48 at 9; *cf.* Dkt. 34, Stmt., ¶¶ 32-36.) "'[O]ccurrence' is defined [in the insurance contracts] as 'an *accident*, including continuous or repeated exposure to substantially the same general harmful conditions.'" (Dkt. 48 a 9; *cf.* Dkt. 34, Stmt., ¶ 34) (Court's emph.)  Thus, as the Court stated, in order to fall within the insurance contracts' respective insuring agreements River City (or Branch, in its stead) must show, at a minimum, that a lawsuit against River City alleges an "occurrence" for which River City may be held liable.  And as the Court rightly noted, the underlying action alleges damage much (but not all) of which fails to qualify as "property damage" resulting from an "occurrence," while other alleged damages clearly fall within the insurance contract's relevant exclusions.

### B.  Branch Misconstrues the Court's Opinion as well as Controlling Law

Turning back to Branch's allegations, the Court then observed what is readily apparent from the underlying complaint:  as the "State Complaint alleges that 'the roof, aluminum and composition siding were not constructed or supplied in accordance with the plans, specifications and industry standards' . . . [t]he alleged damage to the apartments was clearly River City's own work or arose from River City's work.  River City was contracted to handle all of the roofing, which [Shockoe Valley View] Genesis alleges was faulty and led to water intrusion and damage." (Dkt. 48 at 9; *cf.* Dkt. 34, Stmt., ¶¶ 12-20.)  Consistent with Virginia law, the Court therefore concluded that "the damage [to River City's work] does not fall into the definition of 'occurrence,' as there is no alleged accident, but instead merely faulty work and materials."  (Dkt. 48 at 9.) Although the Court did not recite the authorities on this point, there was little need to do so – Virginia law is so well understood in this regard it hardly bears mentioning, as detailed below.

As the insurance contracts do not define the term "accident," that term is to be accorded its ordinary and accepted meaning. *See Lower Chesapeake Assocs. v. Valley Forge Ins. Co.*, 532 S.E.2d 325, 330 (Va. 2000). Webster's Dictionary defines "accident" as "a happening that is not expected, foreseen, or intended[;] an unpleasant and unintended happening sometimes resulting from negligence, that results in injury, loss, damage, etc." WEBSTER'S NEW WORLD DICTIONARY (2d Col. ed. 1984) at 8. The Supreme Court of Virginia has "held that an 'accident' is commonly understood to mean 'an event which creates an effect which is not the natural or probable consequence of the means employed and is not intended, designed, or reasonably anticipated.'" *AES*, 725 S.E.2d at 536 (cit. omit'd). "An accidental injury is one that 'happens by chance, or unexpectedly; taking place not according to the usual course of things; casual; fortuitous.'" *Id.*, quot'g *Fid. & Guar. Ins. U'writers, Inc. v. Allied Realty Co.*, 384 S.E.2d 613, 615 (Va. 1989) (int'l punct. omit'd). Accordingly, the Supreme Court of Virginia has held that the "terms 'occurrence' and 'accident' are 'synonymous and refer to an incident that was unexpected from the viewpoint of the insured.'" *Id.*, quot'g *Utica Mut. Ins. Co. v. Travelers Indem. Co.*, 286 S.E.2d 225, 226 (Va. 1982).

"Generally, under a commercial general liability policy, ***when an 'insured poorly performs its contractual obligations damaging only the insured's work or product, the resulting contractual liability is 'expected' under the terms of its commercial general liability policy,' is not an 'accident,' and therefore is not"*** insured*. *Western World Ins. Co. v. Air Tech, Inc.*, No. 7:17cv518, 2019 WL 1434666, *5 (W.D. Va. Mar. 29, 2019) (emph. supp'd), *cit'g Hotel Roanoke Conf. Ctr. Comm'n v. Donegal Ins. Co.*, 303 F. Supp.2d 784, 786 (W.D. Va. 2004), *aff'd*, 119 Fed. Appx. 451 (4th Cir. 2005).

Furthermore, when a complaint "alleges 'nothing more than allegations of negligent performance of contractual duties,' that are simply not actionable in tort" then a claim of negligence will not suffice to bring the allegations within the scope of insurance coverage.  *Id.*, *quot'g Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 507 S.E.2d 344, 347 (Va. 1998).  In other words, if the pleading alleges "no duty apart from the contract to do what is complained of," then the claim cannot be construed as one of negligence.  507 S.E.2d at 347; *see Oleyar v. Kerr*, 225 S.E.2d 398, 399-400 (Va. 1976).

Thus, "when the damages sought in the underlying action are limited to the costs of replacing the insured's purportedly defective work product, the allegations do not give rise to coverage." *Air Tech*, 2019 WL 1434666, *6, *cit'g Hotel Roanoke*, 303 F. Supp.2d at 786.  *See French v. Assur. Co. of Am.*, 448 F.3d 693, 703-706 (4th Cir. 2006); *Stanley Martin Cos., Inc. v. Ohio Cas. Grp.*, 313 Fed. Appx. 609, 614 (4th Cir. 2009) (unpub'd); *Travelers Indem. Co. of Am. v. Miller Bldg. Corp.*, 142 Fed. Appx. 147, 149 (4th Cir. 2005) (unpub'd); *Catalina London, Ltd. v. Am. Investments Real Estate Corp.*, No. 1:10cv983, 2011 WL 3911104, *2-*3 (E.D. Va. Aug. 31, 2011); *Indiana Lumbermens Mut. Ins. Co. v. Timber Treatment Techs., LLC*, 2017 WL 7691870, *7-*8 (E.D. Va. Oct. 25, 2017), *rep. & rec. aff'd*, 2017 WL 7691869 (Dec. 4, 2017).

Under this clear jurisprudence, the Court was absolutely right in concluding that most – but not all – of the damages alleged in the underlying action do not qualify as "property damage" resulting from an "occurrence."  (Dkt. 48 at 9.)  Branch erroneously asserts that Penn National "never specifically argued that there was no 'property damage' caused by an 'accident' or 'occurrence' under the insuring agreement" as a basis to argue the Court "misapprehended" either the argument or controlling Virginia law in its holding.  (Dkt. 55 at 4-6.)  ***That assertion is demonstrably incorrect***, as Penn National presented this very argument.  (Dkt. 34 at 21-24.)  Even

if Penn National had not made the argument, however (and it obviously did), the Court's holding on this point would still be correct.

Clearly, the Court did ***not*** hold that all of the damages alleged by Branch fell outside Penn National's insuring agreements – only that part of the alleged damage (*viz.*, Branch's own faulty work) fell outside them. And it was for that very reason the Court's opinion then went on to explain the operation of the exclusions cited by Penn National, and why they applied. (Dkt. 48 at 10-12.) Yet Branch seems to assert that *all* of its allegations against River City fell "within the insuring agreement[s]" because Branch managed to allege *some* damage that falls within them. (Dkt. 55 at 7.) That is plainly incorrect. While the fact that some of Branch's allegations fall within the insuring agreement would, absent the operation of relevant exclusions, implicate Penn National's duty to defend, the Court went on to explain why those exclusions applied to Branch's allegations, as discussed below. What is apparent here is that Branch, not the Court, has misapprehended not only the Court's opinion but also controlling Virginia law on commercial liability insurance, particularly as that law applies to exclusions to insurance coverage.

### C. Branch Ignores the Insurance Contracts' Exclusions to Argue that Some of its Underlying Allegations Implicate Insurance Coverage

Despite the Court having rightly criticized Branch for "attempt[ing] to refute [Penn National's] arguments by simply saying they are indemnity arguments and not duty to defend arguments" (Dkt. 48 at 11), Branch persists in that erroneous assertion (Dkt. 55 at 7-8), averring that "Penn National relied upon exclusions in an attempt to pick apart certain allegations in the underlying [c]omplaint." (Dkt. 55 at 8.) Yet as the Court correctly noted, "the exclusions [Penn National] cite[d] are within the four corners of the policies and, thus, it [was] proper for the Court to consider them under the Eight Corners Rule. Therefore, Branch's insistence that they are irrelevant at this stage is misplaced." (Dkt. 48 at 11.) *See AES*, 725 S.E.2d at 535.

1.  The Court Correctly applied the Insurance Contracts' Respective Contractual-
Liability Exclusions

As the Court observed, Branch's underlying complaint "only alleges breach of contract claims and, as discussed above, River City's duty to both Branch and Genesis is contractual. Any judgment against River City in the underlying action would be for contractual liability, which is excluded by the policies' contractual liability exclusions." (Dkt. 48 at 11.) ***That fact is readily apparent from Branch's allegations:*** Branch has alleged that following completion of work on the project and the alleged discovery of water infiltration and property damage there, Branch, "***[p]ursuant to its contractual and legal obligations with Genesis*** . . . undertook to repair the damages to the Apartments and the property damages sustained by Genesis. . . ." (Dkt. 34, Stmt., ¶ 15) (emph. supp'd). "***Pursuant to its contractual and/or legal obligations with Genesis***, Branch also paid (or will pay) Genesis other damages associated with the property damage at the of [*sic*] of the Apartments." (Id., Stmt., ¶ 16) (emph. supp'd). Branch has alleged that River City contractually agreed to defend or indemnify Branch from Genesis' claims and demands, and that River City is therefore contractually liable to it to indemnify it for the costs Branch allegedly has incurred in performing its "contractual and legal" duties to Genesis. (Id., Stmt., ¶ 14.)

But any ***contractual*** liability that Branch might have had to Genesis does not qualify as "tort liability" – a liability that would be imposed by law ***in the absence of any contract or agreement*** – and, therefore, such contractual liability is not exempted from the Insurance Contracts' respective contractual-liability exclusions. (Id., Stmt., ¶ 44.) The Insurance Contracts generally exclude from the insurance provided under them "'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement." (Id., Stmt., ¶ 41.) Excepted from that exclusion is "liability for damages . . . [a]ssumed in a contract or agreement that is an 'insured contract'. . . ." (Id., Stmt., ¶ 42.) The Insurance Contracts define "insured

contract" to include "[t]hat part of any . . . contract or agreement pertaining to [River City's] business . . . under which [it] assume[s] the tort liability of another party to pay for . . . 'property damage' to a third person or organization, provided the . . . 'property damage' is caused, in whole or in part, by [River City] or by those acting on [its] behalf.  However, such part of a contract or agreement shall only be considered an 'insured contract' to the extent [River City's] assumption of the tort liability is permitted by law. ***Tort liability means a liability that would be imposed by law in the absence of any contract or agreement***."  (Id., Stmt., ¶ 43) (emph. supp'd).  Thus, based upon Branch's allegations, River City's alleged indemnity agreement with Branch does not qualify as an "insured contract" because Branch seeks indemnity for its **contractual** obligations to Genesis, and not for tort liability to Genesis.

The key is the source of Branch's alleged duty to Genesis:  Branch avers that it paid (and/or will pay) Genesis for "damages associated with the property damage at" the Project, "***[p]ursuant to [Branch's] contractual and/or legal obligations with Genesis*** . . . ."  (Id., ¶ 15) (emph. supp'd).  That allegation (and binding admission) reveals the nature of Branch's alleged liability to Genesis: it was **contractual**, and not a liability imposed by law in the absence of a contract or agreement. *See Tingler v. Graystone Homes, Inc.*, 834 S.E.2d 244, 254 (Va. 2019) ("In determining whether a cause of action sounds in tort, contract, or both, 'the source of the duty violated must be ascertained'").  Branch does not allege that it owed a common-law duty to Genesis; rather, it alleges that it owed a *contractual* duty, and it is Branch's alleged expenditures in performing that duty for which it seeks indemnity from River City.

Under the economic-loss doctrine, "claims for damages which were within the contemplation of the parties when framing their agreement – such as economic losses and ***damage to property that is the subject of the agreement*** – remain 'the particular province of the law of contracts.'"

*Id.* at 264-65 (emph. supp'd) (int'l punct. & cit. omit'd).  Branch does ***not*** seek indemnity from River City for tort liability – "a liability that would be imposed by law in the absence of any contract or agreement" – but, rather, for Branch's contractual liability to Genesis.  Therefore, the alleged indemnity agreement between Branch and River City does not qualify as an "insured contract" because Branch's own allegations demonstrate that it seeks indemnification from River City not for Branch's *tort* liability to Genesis but, instead, for Branch's *contractual* liability to Genesis.

Branch wholly misunderstands the contractual-liability exclusion.  First, Branch erroneously avers that "there is no such thing" as a contractual liability exclusion, ***despite its obvious, black-and-white presence in the insurance contracts.***  (Dkt. 55 at 14.)  Next, Branch attempts to rewrite Virginia law by asserting – without any legal support whatsoever – that its allegations against River City are insured because the "insuring agreement[s] . . . create coverage for property damage caused by an occurrence or accident.  [They] do not exclude property damage caused by a breach of contract or warranty, as long as there is an occurrence or accident which causes property damage."  (Id.)  The simple fact is that insuring agreements *do not "exclude" anything – that is not their function.*  On the contrary, they define the outermost scope of insurance coverage.  The case law that Branch cites simply stands for the proposition that when an insured contractor's faulty work damages other property, such damage results from an "occurrence" and, therefore, falls within the broad ambit of a commercial liability insurance contract's insuring agreement.  ***Those decisions do not address exclusions generally, much less the contractual liability exclusion.***

Contrary to Branch's bizarre assertion that an exclusion plainly stated in the insurance contracts does not exist, that exclusion (like all exclusions) identifies a category of risk otherwise

falling within the insuring agreement that is ***not*** insured:  liability *other than tort liability* which River City assumes in a contract or agreement.  It is immaterial whether Branch's allegations fall within the insuring agreements of Penn National's insurance contracts if those allegations are clearly excluded under the contractual-liability exclusion – and they are.  As the Court so clearly (and correctly) stated, because "there [is] only a claim for contractual liability [alleged] in the State Complaint, the contractual liability exclusion applies and would bar coverage under the policies even if Branch prevailed on its claims against River City."  (Dkt. 48 at 11.)  The Court's decision is manifestly correct, and Branch has come nowhere near demonstrating "clear error."

　　　　2.　The Impaired Property Exclusion also Operates to Exclude Coverage

The Court was also correct in holding that the insurance contracts' respective impaired-property exclusions operate to exclude insurance coverage based upon Branch's allegations.  The Court noted that "the policies include an exclusion for 'impaired property' which bars coverage for damage to certain portions of the property other than River City's work.  'Impaired property' includes all 'tangible property, other than . . . 'your work,' that cannot be used or is less useful because . . . it incorporates 'your product' or 'your work' that is known or thought to be defective, deficient, inadequate or dangerous."  (Dkt. 48 at 10.)  "The exclusion only applies if the property can be restored by repair, removal, or adjustment of 'your work'."  (Id.)  "This is exactly what Branch is alleging:  the work by River City was defective in workmanship and materials and that defective work caused damage to the roof itself, and other parts of the property."  (Id.; *cf.* Dkt. 34, Stmt., ¶¶ 11-12, 14, 19-20, 37-38.)

The Court's reasoning is irrefutable.  Branch alleged the project was not "constructed in accordance with approved . . . plans, drawings, and specifications" because River City employed "defective workmanship and materials," and because River City was negligent "in the selection of materials and building techniques used" in the Project.  (Dkt. 34, Stmt., ¶ 12.)  River City allegedly

failed to construct or supply the project's roof, and its aluminum and composition siding, "in accordance with the plans, specifications, and industry standards," and also that River City "was negligent, and, as a result, there was water intrusion and property damage to the" Project.  (Dkt. 34, Stmt., ¶ 13.)  Branch alleges it "undertook to repair the damages to the [Project] and the property damages sustained by Genesis. . . ."  (Dkt. 34, Stmt., ¶ 15.)  As a result, Branch asserts it has sustained certain damages in the form of monetary expenditures, and it alleges as well that River City breached an implied warranty on the quality of River City's materials and workmanship "by providing defective materials and/or workmanship on the Project," and avers that it has sustained damages in the form of monetary expenditures as a result of River City's alleged breach of implied warranty, which it seeks to recover in the Underlying Action.  (Dkt. 34, Stmt., ¶ 20.)

The Insurance Contracts provide that the insurance granted under them "does not apply to . . . '[p]roperty damage' to 'impaired property' or property that has not been physically injured, arising out of . . . [a] defect, deficiency, inadequacy or dangerous condition in . . . 'your work' . . . or . . . [a] delay or failure by [River City] or anyone acting on [River City's] behalf to perform a contract or agreement in accordance with its terms."  (Dkt. 34, Stmt., ¶ 38.)  Both Insurance Contracts define "impaired property" to mean "tangible property, other than . . . 'your work', that cannot be used or is less useful because . . . [i]t incorporates . . . 'your work' that is known or thought to be defective, deficient, inadequate or dangerous . . . or . . . [because River City] ha[s] failed to fulfill the terms of a contract . . . if such property can be restored to use by . . . [t]he repair, replacement, adjustment or removal of . . . 'your work'. . . ." (Dkt. 34, Stmt., ¶ 39.)

Even assuming that the repair and replacement of River City's allegedly faulty work – the project's roof and siding – qualified as "property damage" caused by an "occurrence" during the coverage period (and it does not), there can be no question that all of the project's other tangible

property damaged by the alleged water leakage comprises "property damage" "to 'impaired property' . . . arising out of . . . [a] defect, deficiency, inadequacy or dangerous condition in . . . 'your work' . . . or . . . [a] delay or failure by [River City] or anyone acting on [River City's] behalf to perform a contract or agreement in accordance with its terms."  (Dkt. 34, Stmt., ¶ 38.)  That is because the project – other than its roof and siding, which were River City's "work" – meets the definition of "impaired property":  "tangible property, other than . . . [River City's] 'work', that cannot be used or is less useful because . . . [i]t incorporates . . . [River City's] 'work' that is known or thought to be defective, deficient, inadequate or dangerous . . . or . . . [because River City] ha[s] failed to fulfill the terms of a contract . . . if such property can be restored to use by . . . [t]he repair, replacement, adjustment or removal of . . . [River City's] 'work'. . . ."  (Dkt. 34, Stmt., ¶ 39.)

*The restoration of the project to use by the repair and replacement of River City's work, at Branch's expense, is precisely what Branch alleges in the Underlying Action*.  (Dkt. 34, Stmt., ¶¶ 14, 19-20.)  Branch's alleged costs for repairing and restoring the project's damage caused by River City's work is precisely the sort of damage excluded from coverage by the insurance contracts' "impaired property" exclusions.  *See Schnabel Found. Co. v. Nat'l Union Fire Ins. Co.*, 780 Fed. Appx. 5, 12 (4th Cir. 2019) (Md.) (unpub'd) (the apartment-construction project on which the insured allegedly performed defective work was "impaired property" because it incorporated the insured's work, and the property damage the project sustained from that work in the form of repairs and remediation was therefore barred under the exclusion); *Gentry Mach. Works, Inc. v. Harleysville Mut. Ins. Co.*, 621 F. Supp.2d 1288, 1297 (M.D. Ga. 2008) (boilers installed by the insured were "impaired property" damaged by the insured's faulty installation of pedestals to support the boilers, and the boiler damage was therefore excluded).

Branch attempts to narrow the exclusion in contravention of its plain language, by asserting, in essence, that the first clause of the exclusion's language – insurance does not apply to "'property damage' to 'impaired property' *or* property that has not been physically injured, arising out of . . . [a] a defect, deficiency, inadequacy or dangerous condition in . . . 'your work' . . . or . . . [a] delay or failure by [River City] or anyone acting on [its] behalf to perform a contract or agreement in accordance with its terms" (emph. supp'd) – should be read as if the first portion, "property damage" to "impaired property," was not there.  (Dkt. 55 at 11.)  In other words, Branch would like the Court to rewrite the exclusion so that it only applies to "property that has not been physically injured."  (Id.)

That would certainly be convenient for Branch, as Branch argues that it has alleged physical damage to property other than River City's work at the project, in the form of water damage. (Dkt. 55 at 11-12.)  But the exclusion applies to more of Branch's allegations than Branch wants to admit:  it excludes "property damage" to "impaired property" – "tangible property, other than [River City's work], that cannot be used or is less useful because . . . it incorporates [River City's work] that is known or thought to be defective, deficient, inadequate, or dangerous," or because River City has "failed to fulfill the terms of a contract or agreement – if the property can be restored to use by the repair, replacement, adjustment or removal of River City's work, *or* by River City fulfilling the terms of its contract or agreement.

***All of Branch's allegations of damage to property other than River City's work fall within this exclusion:***  Branch has alleged that River City failed to fulfill the terms of its contract with Branch by failing to indemnify Branch not only for the cost of repairing and replacing River City's faulty work, but also for the cost of repairing other work or property damaged by water.  That allegation clearly states "property damage" to "impaired property" that could be fixed not only by

the repair, replacement, adjustment or removal of River City's work, but also by River City fulfilling the terms of its contract or agreement *by indemnifying Branch for the cost of repairing the alleged water damage*. Branch is correct in saying that "[r]emoving and replacing the roof and siding does not magically fix the water-intrusion property damage to the rest of the building" (Dkt. 55 at 12), but the exclusion requires no such hocus-pocus. The exclusion applies because Branch alleges it was able to render the property usable by repairing the alleged water damage *for which Branch contends River City bears a contractual duty to indemnify Branch*, *i.e.*, by River City fulfilling the terms of its contract for indemnification. Branch's own allegations thus place them entirely, and clearly, within the exclusion's ambit.

Applying the exclusion according to its plain meaning does not render the insurance contracts "meaningless," contrary to Branch's erroneous assertion. (Dkt. 55 at 12.) Rather, the exclusion makes clear that Penn National did not agree to insure against damages resulting from River City's faulty workmanship, which is the very purpose of the so-called "business risk exclusions." *See Gentry Mach. Works*, 621 F. Supp.2d at 1294 ("The 'your work', 'your product', 'impaired property', and 'recall' exclusions are often characterized as 'business risk' exclusions. The purpose of 'business risk' exclusions is to ensure that liability for faulty or defective workmanship is properly allocated between the insurer and the insured"). Nor is there any ambiguity in the exclusion's language, despite Branch's Hail-Mary assertion of ambiguity (Dkt. 55 at 12-13): there is only one reasonable interpretation of the exclusion, though it is not the interpretation Branch would like the Court to adopt. Here, too, there is no clear error's decision; there is only clear validity.

For all these reasons, the Court should grant the Motion and enter final judgment in Penn National's favor.

Respectfully submitted,

**PENNSYLVANIA NATIONAL MUTUAL
CASUALTY INSURANCE COMPANY**

By:  SETLIFF LAW, P.C.


            /s/ Kevin T. Streit
               Of Counsel

Kevin T. Streit (VSB No. 45024)
SETLIFF LAW, P.C.
4940 Dominion Boulevard
Glen Allen, Virginia 23060
(804) 377-1260
(804) 377-1280 (facsimile)
kstreit@setlifflaw.com
*Counsel for Pennsylvania National
    Mutual Casualty Insurance Company*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 28th day of March, 2022, a true copy of the foregoing was

transmitted to the following via the Court's ECF system:

> Kenneth F. Hardt, Esq.
> Sinnott, Nuckols & Logan, P.C.
> 13811 Village Mill Road
> Midlothian, Virginia 23114
> khardt@snllaw.com
> *Counsel for Branch Builds, Inc.*

_____/s/ Kevin T. Streit_____
Kevin T. Streit (VSB No. 45024)
SETLIFF LAW, P.C.
4940 Dominion Boulevard
Glen Allen, Virginia 23060
(804) 377-1260
(804) 377-1280 (facsimile)
kstreit@setlifflaw.com
*Counsel for Pennsylvania National Mutual
   Casualty Insurance Company*
